(No. 6840—)

CHARLES E. BREWER, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed November 24, 1975.*

PEFFERLE, MADDOX & GRAMLICH, by CHARLES J. GRAMLICH, Attorneys for Claimant.

WILLIAM J. SCOTT, Attorney General; HOWARD W. FELDMAN, Assistant Attorney General, for Respondent.

BURKS, J.

Claimant brought this suit against the State for the value of a coin collection which he exhibited at the 1971 Illinois State Fair and which was stolen or disappeared from the exhibit area. The value of the lost collection was $3,929.30, according to the complaint.

Claimant argues that a mutual benefit bailment was created, and that it was the duty of the State to protect the exhibit against theft. Respondent argues that the State cannot be held responsible as an insurer of exhibits at the State Fair, and cites the rules and regulations pertaining to exhibitions at the State Fair which purport to contain an express denial of responsibility for loss or damage to exhibits or any part thereof. The following is a brief summary of the facts:

The Claimant, Charles Brewer, is an elderly man

whose hobby was coin collecting. He had exhibited his coin collections at the Illinois State Fair for a number of years prior to 1971 and won several awards.

Brewer set up his exhibit on August 10, 1971, in the Exhibition Building on the Illinois State Fairgounds at a spot designated for coin exhibitions by the State Fair Agency. Between 9:00 p.m. Sunday, August 22, 1971, and 8:15 a.m. Monday, August 23, 1971, certain portions of Mr. Brewer's collection disappeared.

Claimant arranged the exhibit as he had desired it, "to make it look attractive," and then observed while an employee of the Respondent locked the case. The Claimant never had a key to his exhibit. He testified that he could not even go behind the showcase unless he was accompanied by an authorized employee of the State. The aisle behind the showcase was "off limits," Claimant said, and all exhibitors were treated the same.

There was no evidence in this case as to what happened to Mr. Brewer's coin collection other than it disappeared over the weekend. Yet, it seemed clear to the manager of the State Fair, Bob Park, that Claimant's property was stolen. Mr. Park's letter to the Claimant, dated October 14, 1971, reads in part, "Certainly all of us at the Fair regret this *theft* very sincerely and I will be glad to talk to you further about the problem since it seems that *our guard system left much to be desired.*"

Again on January 26, 1972, the manager of the State Fair, Mr. Park, wrote the Claimant acknowledging that Claimant's loss was due to theft, a fact confirmed by the testimony of Mrs. Vera Marvel, superintendent of the hobbies displays. She said the back of Claimant's display case was broken into and the lock was pried off. Both Mrs. Marvel and Mr. Denton who was manager of competitive events at the Fair "corrobo-

rated Mr. Brewer's statement that security was extremely weak in this particular building at the Fair that year," as Mr. Park acknowledged in his testimony at the hearing.

The manager of the Fair also testified that, in his opinion, the State Fair Agency had some responsibility for Claimant's loss under *Ill.Rev.Stat., Ch. 127, §405,* which reads as follows:

> The State Fair agency is empowered to police the State Fair Grounds, maintain and preserve order thereon, *and protect exhibits from theft,* injury or destruction.

Mr. Park's second letter to the Claimant expressed his regret that there was no item in his budget to handle a reimbursement for Claimant's loss and advised Mr. Brewer to file his claim in this Court. Mr. Park added, "I feel there is merit in your case."

This Court cannot predicate liability of the State upon the generous remorse felt by representatives of the State Fair Agency toward Claimant's loss. However, we do regard their testimony and letters as tantamount to a Departmental Report as contemplated by our Rule 14. From this prima facie evidence, which was not effectively refuted, we conclude that Claimant's coin collection was stolen from its showcase in the Exposition Building due to the State's negligence in admittedly failing to provide "reasonable protection" for Claimant's exhibit in 1971. As Mr. Park testified, "Evidently that reasonable protection was lacking that year."

We accept the definition of the term "bailment" as stated in Respondent's brief and as quoted in *I.L.P. Bailments §2.*

> The term 'bailment' has been defined as the delivery of goods for some purpose under a contract, express or implied, that after the purpose has been fulfilled they shall be redelivered to the bailor or otherwise dealt with according to his directions or kept until he reclaims them.

We do not accept Respondent's novel theory that, in

the case at bar, there was no contract of bailment, either express or implied, since there certainly was a transfer of possession of Claimant's personal property to the Respondent without transfer of ownership. There was also considerably more than the implication of a contract of bailment between the parties, so we need not dwell on the two cases cited by the Respondent supporting the general rule that the State cannot be held liable for breach of an implied contract. That rule as applied in *Dutton v. State, 16 Ill.Ct.Cl. 64,* was on a claim for personal services performed and in no way analogous to the case at bar. Nor do we believe it was appropriately relied on in *Schwemer v. State, 19 Ill.Ct.Cl. 149,* wherein the Claimant, an insane person, lacked the capacity to enter into a bailment contract.

In the case at bar, Claimant received a written invitation from the Respondent to display his exhibit at the 1971 State Fair. The invitation was clearly stated in the "General Managers Foreward" of the booklet Claimant received through the mail (Claimant's Exhibit 5) which contained the rules and regulations for exhibitors adopted and promulgated by the State Fair Agency pursuant to *Ill.Rev.Stat., Ch. 127, §403.*

Claimant accepted the State's invitation, together with its rules and regulations, by entering his coin collection in the "Hobby Division" of the State Fair as he had done in prior years. The specific category covering Mr. Brewer's collection is described as "Antiques and Numismatics, Lot 135."

Claimant was charged a registration fee of $2.50 as required by the rules. Exhibits such as Mr. Brewer's were accepted for their educational purposes. In return for the fee paid and for the benefits derived for the fairgoers, the State Fair Agency awarded prizes to various exhibitors if their exhibits merited an award. Per-

sons exhibiting at the fair were thus given the opportunity to have their collection compared with those of others, the publication of their ownership of such collections, and the possible esteem of their fellow citizens and hobby enthusiasts. As the booklet states, the exhibitors "provide the color and taste so vital and such an integral part of a successful fair."

From the above facts, we find that a contract of bailment was created for the mutual benefit of the parties. The fact that the contract was not expressed in a single written document is immaterial, although such a document might have removed all doubts as to the rights, duties, and obligations of the parties.

Here, those rights and obligations must be governed by the State's rules and regulations for exhibitors, accepted by the Claimant, interpreted in the light of the following general rule applicable to mutual benefit bailments found in *I.L.P. Bailment §14:*

> In the absence of special contract, where the bailment is for mutual benefit, the bailee [the State] must exercise ordinary care or diligence with respect to the subject matter of the bailment, or, in other words, the State must exercise such care as an ordinarily or reasonably prudent man would take of his own goods of like character under similar circumstances. In determining what constitutes proper care of property by a bailee for mutual benefit, the nature and value of the property, the means of protection possessed by the bailee, the relationship of the parties, and other circumstances must be considered.

Applying the above rule to the case at bar, we believe that the "nature and value" of a coin collection merits a higher degree of care by the bailee than many other types of exhibits having less intrinsic value or, because of their size or weight, are not so likely to be stolen. Moreover, we cannot excuse the bailee on the grounds that it did not possess adequate "means of protection."

We have previously concluded, from the testimony of Respondent's agents, that reasonable protection for

Claimant's exhibit was lacking. We must turn then to the rules and regulations if Respondent is to be saved from liability for Claimant's loss. The pertinent rules are 7 and 13, which read:

> 7. No responsibility shall be attached to the State of Illinois, State Fair Agency or employees thereof for loss or damage to exhibits or any part thereof.
>
> Every precaution will be used in care of handling of exhibits including continuous police protection.
>
> 13. All entries must be removed from building Monday, August 23rd. The State Fair will not be responsible for articles not picked up Monday, August 23rd.

The disclaimer of responsibility in the first part of Rule 7, standing alone, would appear to dispose of this controversy summarily in favor of the Respondent. But it does not stand alone, and such disclaimers of liability in a bailee's contract must be strictly construed against the bailee. *I.L.P. Bailments §13.*

The second part of Rule 7 and the implication to be drawn from Rule 13 are not compatible with the disclaimer of liability. The State's promise of "continuous police protection" and that "every precaution will be used in the care of exhibits" obviously were not fulfilled in Claimant's case.

The statement in Rule 13 that "the State Fair will *not* be responsible for articles *not* picked up Monday, August 23rd," implies that it *would be* responsible for loss prior thereto. This implication contradicts the disclaimer of responsibility in Rule 7 and creates an ambiguity in Respondent's rules.

Even if we could in good conscience find that there is more than one reasonable interpretation of the inconsistent language in question, the doubt must be resolved against the Respondent, since the Respondent prepared the rules and regulations and chose the language. This venerable rule of contract construction, firmly established in Illinois, is restated in *I.L.P Contracts §221* as follows:

> Words which are ambiguous or of doubtful construction are to be construed most strongly against the party who prepared the contract, for the reason that he chose the language and is responsible for the ambiguities in his own expression.

> This rule obtains not only in grants, but extends in principle to all other engagements and undertakings; and in construing reservations or conditions inserted in a contract for the benefit of the party who makes them, where there are clauses which are doubtful or ambiguous, that construction will be adopted which is least favorable to the party making them.

We note, parenthetically, that the State's promise of "continuous police protection" for exhibits was deleted from its rule book for the following year, 1972, according to the testimony of the manager of the fair.

Based on the above stated "resolve doubts against the draftsman" rule, and upon the preponderance of evidence that Respondent failed in its promise to provide "continuous police protection" for Claimant's exhibit, we find the Respondent liable for the theft of Claimant's coin collection over which the State assumed exclusive custody and control and kept the only keys. These facts distinguish the State's duty in the case at bar from, for example, the duty of a local police department in undertaking to protect private homes within its jurisdiction. Certainly the police are not insurers of such homes nor of the safety of individual citizens.

The facts also distinguish this case from *Wall v. Airport Parking Co., 41 Ill.2d 506,* holding that a bailment is not created where an automobile is self-parked in a lot and the owner retains the keys. Here the State retained the keys.

We do not believe that the State Fair intended to be, or should be, an insurer of all exhibits. We merely hold that the facts in this particular case justify a finding that the State Fair Agency negligently failed in its assumed obligation to protect Claimant's coin collection from theft.

The question of determining the exact value of Claimant's loss is more difficult for the Court than in finding liability. The only witnesses who testified supported Claimant's Bill of Particulars showing that the value of his lost coins was $3,929.30.

In addition to the testimony of the Claimant and his wife, the claimed value of Claimant's loss was supported by the testimony of Ronald M. Murphy, a full time coin and art dealer in Springfield, an expert in coin collection, who had exhibited his own coin collections at the State Fair for the last 18 years. Mr. Murphy, a life long resident of Springfield, testified that he was familiar with Claimant's coin collection, had examined it in prior years, and saw it on display next to his own exhibit at the 1971 fair. Mr. Murphy knew that the Claimant had certain sets of coins in there. Although he didn't study Claimant's exhibit coin by coin to know the condition of each individual coin, Mr. Murphy said he would swear that Claimant had each and every one of the sets listed. Mr. Murphy added, "I do know that, from reading the list of items taken, that there was no doubt other items taken that were not on the list." Claimant left out several rare coins he did not purport to own.

The weakness in Claimant's evidence as to value of his lost coins is that he did not have an inventory of his collection prior to his loss and had to compile a list of his coins from memory with the aid of his wife. As Chief Justice Perlin said in *Giedraitis v. State, 26 Ill.Ct.Cl. 419, 425,* "This Court has held that it is fundamental

that the burden of proving the element of damages is upon Claimants." We said in *Frega v. State, 22 Ill.Ct.Cl. 399, 400:* "The proof required to establish damages must not be remote, speculative, nor uncertain." We do not interpret these rules to mean that a Claimant is entitled to nothing unless he can prove the amount of his loss down to the exact dollar. Many insureds do not have an inventory of their household contents prior to a fire loss, and their records of purchase may also be lost in the fire. Reputable insurers will honor their claim on the best evidence available, as we must do in the case at bar. In *Giedraitis* we denied a portion of the claim relating to the value of a boat and its accessories. Claimant had paid $500 for the boat plus a promise of medical services to the seller. Claimant had recovered $500 for loss of the boat from his insurance company but could not remember how much medical service he had since rendered the seller. Obviously, such faulty memory could not be regarded as admissible evidence sufficient to support an additional award.

Fortunately, the Claimant here was very familiar with his coin collection, and his expert witness, Ronald Murphy, a long established coin dealer in Springfield, had a general knowledge of the coins in Claimant's collection.

Each of Claimant's lost coins, 199 in all, were listed in his Bill of Particulars with the value of each coin as shown in Claimant's Exhibit 5, *A Guidebook of United States Coins, 25th Edition, 1972,* a book which Mr. Murphy had testified was "the bible" of the coin collection hobbyist. Respondent does not dispute the authority of this book, but points out the extreme variance in the listed values of each coin, depending on their condition. The guidebook "bible" lists different values for the same

coin under its condition described as "fair, good, very good, fine, very fine, extremely fine, or uncirculated."

A small group of Claimant's coins were shown as "uncirculated" or of uncirculated quality. A few were listed as "good" and most were priced as being "very fine" or "extremely fine." Although the exact condition of each coin was exclusively within Claimant's knowledge, we believe his evaluations are generally supported by the fact that his collection won three blue ribbons at the 1971 State Fair before his coins were stolen.

We take notice that long experienced coin collectors, as Claimant was, pride themselves on the condition of their coins; that Claimant's collection exhibited at the State Fair was in competition with other coin collectors throughout the State; and that Claimant's collection was regarded as best in three categories by the judges at the fair.

While we also know that coin collections tend to increase rather than depreciate in value, we have taken into account that there was some degree of uncertainty in Claimant's proof of loss based on his memory. He was, as Respondent points out, somewhat confused in his testimony under cross-examination. Considering Claimant's age, his confusion could be attributed to excitement under the unusual circumstances of a trial. In any event, it is the judgment of this Court that Claimant is entitled to an award in the sum of $3,500, an amount approximately 10% less than the amount claimed, due to the degree of uncertainty we find in his proof of loss.

Claimant is hereby awarded the sum of Three Thousand Five Hundred Dollars ($3,500) for his loss of personal property.