5

(No. 77-CC-0315-)

J. F. INCORPORATED, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Order on motion to dismiss filed January 19, 1983.*

*Order on denial of rehearing filed March 14, 1983.*

*Opinion filed November 29, 1988.*

LERITZ & REINERT & DUREE (DAVID M. DUREE, of counsel), for Claimant.

NEIL F. HARTIGAN, Attorney General (MICHAEL TAYLOR, LEE MALANY, and WILLIAM E. WEBBER, Assistant Attorneys General, of counsel), for Respondent.

## ORDER ON MOTION TO DISMISS

HOLDERMAN, J.

This matter comes before the Court upon motion of Respondent to dismiss and Claimant's response to said motion.

Respondent's motion sets forth that this case was filed on February 22, 1977, over five years ago. Said motion further states there have been no formal general continuances requested or granted, and there have been no annual status reports submitted to the Court as required under section 790.70 (74 Ill. Adm. Code 790.70) relative to general continuances. Respondent's motion further states that a failure to properly seek a general continuance is a violation of section 790.60a (74 Ill. Adm. Code 790.60a) of this Court. Respondent concedes that it still owes Claimant the amount of $100.00.

Claimant, in its response to Respondent's motion, states that litigation is still pending in other courts but offers no explanation of any kind or character as to its failure to comply with the rules of this Court as to general continuances and status reports.

An award is hereby entered in favor of Claimant in the amount of one hundred ($100.00) dollars, and any further award is denied Claimant due to its failure to comply with the rules of this Court. Said award of $100.00 is to be considered full and complete payment of all claims allegedly due Claimant.

## ORDER ON DENIAL OF REHEARING

HOLDERMAN, J.

This matter comes before the Court upon petition of Claimant for rehearing filed January 25, 1983.

This cause was originally dismissed by order entered January 19, 1983, for violation of sections 790.70 and 790.60a (74 Ill. Adm. Code 790.70, 790.60a) of the rules of this Court. As stated in this order of dismissal, this cause was filed February 22, 1977, and Claimant did not file any annual status reports as required under section 790.70 relative to general continuances. Said order also stated that the Claimant failed to seek a general continuance as required by section 790.60a.

It is unfortunate that Claimant failed to observe the rules of the Court, but the Court calls attention to the fact that these rules are necessary for the protection of Claimants as well as Respondents so that an orderly procedure in the handling of cases before the Court can be maintained. Complete disregard of the rules, such as in this instance, defeats the very purpose of the Court of Claims Act.

It is hereby ordered that Claimant's petition for rehearing be, and the same is, denied, Claimant's request for vacation of the Court's order of January 19, 1983, is denied, and the Court's order of January 19, 1983, is hereby reaffirmed.

## OPINION

MONTANA, C.J.

The Claimant, J.F. Inc., brought this claim seeking damages incurred due to delays and other problems Claimant encountered in the performance of a construc-

tion contract with the Respondent's Capital Development Board (hereinafter referred to as the CDB). A hearing in the case was held October 25, 1985, and oral arguments before the full Court were heard January 12, 1988.

In September of 1973, the CDB awarded contracts for the construction of two buildings for the Alton Area Career Development Center. Alton Community Unit School District No. 11 became the ultimate user. The Claimant was awarded a prime contract for the heating and electrical work. S.M. Wilson & Company was awarded a prime contract for the general construction work. Both contracts were for fixed amounts with identical language and completion dates. General obligations of the parties were set out in the contracts and the specific contractual requirements were established in the specification book and the drawings. The contract documents specified 500 calendar days for completion which would have been January 25, 1975. However, due to the delays, the project did not receive a certificate of final acceptance until August of 1976.

Because the Claimant incurred costs for various delays, it filed suit against S.M. Wilson on the contract between S.M. Wilson & Company and the CDB alleging it had third-party beneficiary status. S.M. Wilson & Company counterclaimed on the same theory. Claimant also sued the architect for negligence. At the conclusion of the jury trial, the jury returned a verdict in favor of the Claimant for $37,000 on the contract count and against the Claimant on the counterclaim for $5,000. The jury also awarded Claimant $8,000 from the architect. S.M. Wilson & Company appealed. The record does not indicate if the architect appealed.

During the pendency of the appeal the case at bar

went to trial. The Respondent's defense primarily consisted of blaming the delays on S.M. Wilson & Company and the other contractors and arguments of *res judicata* and collateral estoppel.

After the hearing on the case at bar was concluded, the appellate court for the Fifth Appellate District rendered its decision. The appellate court's decision is reported in *J.F. Inc. v. S.M. Wilson & Co.* (1987), 152 Ill. App. 3d 873, 105 Ill. Dec. 748. A rehearing was denied March 10, 1987, and the supreme court denied *certiorari*. The appellate court reversed the lower court decision and essentially found that neither J.F. Inc. nor S.M. Wilson & Company had third-party beneficiary status which would enable them to sue each other on their contracts with the CDB and that a lawsuit in the Court of Claims against the CDB was the appropriate procedure to follow in seeking damages for delays.

Having explained the background, we will now turn to the various items of damages claimed in the order that they were itemized in the Claimant's brief. First, Claimant is seeking $231,500.08 and $19,041.75 for cost overruns associated with delays occurring in the performance of the electrical contract and heating contract, respectively. There is no question that delays occurred. The contracts specified that the project was expected to be completed in 500 days when in fact it took over 1000 days.

There was much testimony and finger pointing as to the cause of the delays. The project was delayed from the beginning due to problems with removal, relocation, and compaction of the earth which was primarily the responsibility of the general contractor, S.M. Wilson & Company, who had subcontracted to have the work done. There was testimony also that the architect on the

project did not adequately supervise the work and allowed the delays to occur. Obviously, the Claimant could not proceed with its electrical and heating work until certain other phases of the construction were completed. There was no evidence that the Claimant contributed to any of the delays. There was evidence that the Claimant continuously notified the CDB that delays were occurring and costs were mounting.

Claimant's contract was with the CDB. The CDB has the primary responsibility for making the work site available to the contractor in time for the contractor to do the work. As owner, the CDB is legally liable for the delays and resulting damages. The fact that the CDB separately contracted with other entities who may be to blame for the delays is of no consequence in this action. If the CDB is damaged by the actions it attributes to others, it may pursue those it believes caused the damage. Under circumstances as are involved here, where all the parties to the contract cannot sue each other in one forum, this result must obtain. The court in *J.F. Inc. v. S.M. Wilson & Company* stated:

" ° ° ° (T)his court finds that if the owner failed to make the site available to the contractor in time for the contractor to do its work, the contractor may sue the owner. (See *W. H. Stubbings Co. v. World's Columbian Exposition Co.* (1903), 110 Ill. App. 210.) In this case, the prime contractor may sue the State in the Court of Claims (Ill. Rev. Stat. 1985, ch. 37, par. 439.1 *et seq.*) for its failure to properly supervise the construction project. (Ill. Rev. Stat. 1985, ch. 127, par. 780.04.) Even if the contract contained a no-damage-for-delay provision, a prime contractor may sue and recover from the owner for delay damages caused by another prime contractor. (*United States Steel Corp. v. Missouri Pacific R.R. Co.* (8th Cir. 1982), 668 F.2d 435, 438-40.) Thus, the appropriate procedures for a prime contractor are change orders and possible lawsuit in the Court of Claims." *supra*, 152 Ill. App. 3d 873, 878.

It is practically inevitable that all construction projects will suffer delays of one form or another, particularly projects calling for coordinated efforts by multiple contractors. For a delay to be tolerated, it must be reasonable under the circumstances. The delay on

this project was considerable and, other than to try to put the blame on the other contractors, the Respondent offered little to show excuse. The Respondent's main defense is that the completion date was provisional and did not impose a duty upon the owner to ensure completion by that date, citing *Edwards Construction Co. v. Illinois State Toll Highway Authority* (1975), 34 Ill. App. 3d 929, 340 N.E.2d 572. In *Edwards*, the court held that the owner was not liable for delays caused to a second phase contractor on the basis of a schedule that did not afford the plaintiff a prepared worksite upon which to perform. The court held that that contract provided a completion date, but that the completion date was provisional and did not impose a duty upon the owner to ensure completion by that date. Cases interpreting contracts all vary by the terms of the different contracts and the parties' understandings and reasonable expectations and are distinguishable on those bases. However, the *Edwards* case and this case do have several similarities. Among the factors the Court in *Edwards* considered in reaching its opinion were:

1. The same completion date for all the contractors;

2. Anticipation that the plaintiff's work would depend on preliminary work done by other contractors;

3. The contract gave the owner a right to change plans and interrupt the continuity of the work.

The same factors are presented in this case. The general contract with S.M. Wilson and the electrical contract with the Claimant both called for completion in 500 days. In bidding the contract, the Claimant only had the completion date to work backward from or a general estimate of when the work of the others would be completed to arrive at an expectation of a starting date. Still, the delays on the project greatly exceeded

anything reasonable or foreseeable. Nor could adjustments be made as the project slowly progressed because various work schedules were never approved.

Claimant was aware that its work depended on site preparation by S.M. Wilson & Company. Further, at the time Claimant bid the contract, it was aware that the general contractor should have a work schedule after the awarding of the contract. On cross-examination, in response to the question, "In fact, on this project when you prepared the estimate you cannot do [*sic*], you did not make an estimate of the time that would be required to excavate the site, did you?", Claimant's president stated, "No, I didn't." However, even if Claimant was unable to depend on an exact starting date, there was no evidence to show why he could not expect to rely on an outside completion date. Even if we were to find that the completion date was provisional, Claimant should still have been able to rely on a reasonable completion date. Respondent has not suggested that the CDB could have allowed the project to go on forever. The delays in this case were beyond being reasonably within provision. Still, Respondent's argument has merit and we will consider it further in determining the amount of damages suffered.

The third similarity, that the contract in the *Edwards* case provided that the owner could change the work or interrupt its progress, thereby altering any schedule once the project started, is in the Claimant's favor. In the case at bar, the contract included the general conditions which, in section 8.3.4 (S-29) provides:

"This paragraph 8.3 does not exclude the recovery of damages for delay by either party ° ° °"

Respondent's reference to several sections of the general conditions, at page 14 of its brief, inaccurately

suggests that Respondent could change the work or interrupt the progress or alter the schedule without paying additional costs. Sections 12.1.1 and 12.1.2 of the general conditions (S-32) provide that any changes in the work made by Respondent must be by written change order with "the contract sum and the contract time being adjusted accordingly." Nothing in the sections cited by Respondent at page 14 of its brief permits the Respondent to change the time of completion without granting additional costs to the Claimant.

We find that the Respondent has the responsibility for the damages sustained by the Claimant due to the delays. However, the damages are difficult to ascertain with exactitude. Claimant testified that his losses occasioned by the delays were not related to costs of materials but to labor costs. Claimant produced sufficient evidence that his actual labor costs exceeded his estimated labor costs by $175,098.88 on the electric contract and $13,471.34 on the heating contract. Unrefuted testimony by the president of J.F. Inc., James Fowler, as to the reasonableness of the estimates was that the bid was within 1 or 2% of the next lowest bidder on the electrical contract and within 4 or 5% of the next lowest bid, with the other bids very near his on the heating contract. The increased labor costs were attributed to wage rate increases, loss of efficiency because of the necessity of stopping and starting work at various times, and the requirement of having supervisory personnel on the project for 1000 days instead of 500 days.

However, with the unknown variable of an exact starting date, the fact that some delay is inevitable, the inherently speculative nature of computing loss of efficiency and the six-week strike, we find that Claimant's losses occasioned by delay to be $135,000 on the

electrical contract and $11,000 on the heating contract. Admittedly these figures are somewhat arbitrary, and the delays were primarily the responsibility of the Respondent, but we do not think that the damages are computable down to the penny as Claimant has tried to show. As triers of fact, it is our responsibility to arrive at an amount after weighing the evidence. (*Neylon v. State* (1986), 39 Ill. Ct. Cl. 65.) We think that our findings represent a fair amount.

Other factors Claimant seeks to have considered in arriving at the damages for the delays are overhead, earnings, and extra front office administrative costs. Claimant seeks an additional 15% for overhead and an additional 10% for earnings. He testified he usually used those percentages for change order work. However, he also testified that he used 10% for overhead and 10% for profit in making his bid. We find overhead and profit appropriate items of damages and will allow 10% for each. Multiplying the previously stated amounts of damages by these percentages, we find additional damages in the amount of $29,200. As for the additional front office administrative costs, Claimant seeks $50 per hour for 200 extra hours on the electrical contract and for 40 extra hours on the heating contract. This cost, Claimant claims, is for the people involved in the front office whose time does not appear on time cards, *i.e.* salaried personnel, and whose duties included writing checks and attending meetings. The exact number of hours worked by the front office personnel attributable to the delays was not logged nor was the rate of $50 per hour substantiated by anything other than the testimony of Mr. Fowler that both the number of hours and cost were very reasonable figures. Regardless, we find any such costs are covered under the factor for overhead which we have previously allowed.

In addition to damages for cost overruns due to delays, Claimant seeks compensation for its expenses in installing hydraulically compressed connectors or "hy-plug" terminators as the parties referred to them. The specifications for the electrical work permitted either copper or aluminum electrical wire conductors. The choice was up to the bidder. Aluminum was less expensive than copper and the Claimant bid the less expensive way of doing the job. Had copper wire been chosen, set screws could have been used for connectors. Aluminum wire necessitates the use of the more expensive hy-plug connectors. Claimant submitted a request for a change order to use the hy-plugs. The request was approved and the change order was issued but with no increase in compensation allowed.

Helpful to our understanding of the matter was testimony by way of affidavit from the Respondent's expert, Joseph B. Summers. Paraphrasing his testimony, he explained that an aluminum conductor must be larger than the copper conductor required to carry a specific load. The use of set screw connectors in conjunction with aluminum conductors is unreliable and unsafe. A set screw connector is a sleeve which fits over an exposed conductor. A set screw in the sleeve is tightened, fastening the sleeve to the conductor. A set screw is inappropriate for use with an aluminum conductor because of the tendency of aluminum conductors to creep or shrink as the conductors heat and then cool over time as the result of electrical loads varying over time from large to small. This shrinkage loosens the connection between the sleeve and the conductor, resulting in increased risk of the conductor becoming pitted or corroded, of arcing, of the connection breaking, and of the conductor separating from the sleeve. There can also be a problem with the

aluminum conductor oxidizing after the connection becomes loose, and then overheating at the connection point because of increased surface resistance of the conductor. Copper conductors are, however, suitable for use with set screws because copper does not creep or shrink as does aluminum.

Mr. Summers went on to explain that hydraulically compressed connectors, or hy-plugs, are the proper connectors to be used with aluminum conductors. Hy-plugs also consist of a sleeve which fits over the exposed conductor. This sleeve however is compressed by means of a special tool which crushes the sleeve into a tight fit with the conductor. The force of the compression is so great that, within the sleeve, the conductor itself is deformed. The use of the hy-plug results in a much tighter fit between the sleeve and the conductor, thus preventing loosening of the bond between the sleeve and the conductor and also preventing oxidation of the service of the conductor. Use of different connectors depending on which conductor is used is the accepted norm in the industry.

It is the Respondent's position that the Claimant is not entitled to compensation for the increased cost of the hy-plugs. Respondent argues that the specifications called for conductors and was silent as to the connectors. Because the Claimant chose to use the less expensive aluminum wire, he should bear the added expense of the hy-plugs necessitated thereby.

Although the Respondent's position sounds reasonable, the evidence indicates that such was not the intent of the parties. The Claimant submitted an estimate of $65,000 in connection with the change order. The parties were unable to agree on a price. When the change order was issued, it stated that the amount of

Claimant's contract was thereby increased in accordance with article 12.1.4 of the general conditions of the contract. Said article provides that when the owner and contractor cannot agree upon the amount of a change order:

"° ° ° (T)he Contractor, provided he receives a Change Order, shall promptly proceed with the Work involved. The cost of such Work shall then be determined by the Architect on the basis of the Contractor's reasonable expenditures and savings, including, in the case of an increase in the Contract Sum, a reasonable allowance for overhead and profit."

The parties' intention that the Claimant be compensated an additional amount for the hy-plugs is further evidenced by correspondence between James Fowler, the president of J.F. Inc. and Thomas Madigan, the acting manager for project development for the CDB. Mr. Fowler wrote the CDB after receipt of the executed change order questioning the CDB's direction to proceed with no contract increase. Mr. Madigan wrote back stating:

"Your question regarding the insertion of no dollar change amount on the lower portion of the document and on our letter of transmittal is understood. The no dollar change figure is *only* for accounting purposes at this time. The intent of the document is exactly as spelled out in its content. You were directed to proceed with the work in accordance with A.I.A. A201, Article 12.1.4 with the cost to be determined later. Your cooperation to quickly complete the work in accordance with the document is earnestly solicited."

The Claimant went ahead and performed the hy-plug work using a separate crew and keeping separate cost records. Including overhead and profit, Claimant computed the cost of the additional work to be $40,163.29 and billed the CDB for that amount. The CDB allowed an extra cost of $18,373.40 based on an estimate from the mechanical engineer which estimate was prepared before the work was performed. As quoted previously, article 12.1.4 provides that cost is to be determined by the architect on the basis of the contractor's reasonable expenditures. Neither the architect nor the mechanical engineer prepared an

estimate of the actual cost after the work was performed. No evidence was offered to counter the Claimant's evidence of its actual expenditures for this extra work. We have no basis for finding that the costs submitted by the Claimant were based on anything other than reasonable expenditures. After allowing credit for the $18,373.40 paid by the CDB and reducing the amount of overhead by 5%, we find that the Claimant has suffered damages on this item in the amount of $19,781.73.

The next item of damages sought by the Claimant arose as a result of a fire on the site during the job. The fire damaged an electrical switch-gear which was repaired by the Claimant at a cost of $10,500, again including overhead and profit. As to this cost there does not appear to be a dispute. The dispute centers on whether the CDB should be held responsible for the payment of the cost. The supplemental general conditions of the contracts set forth in the specifications amended in part the general conditions, article 11.3, to provide that the general contractor, S.M. Wilson & Company, would furnish the builder's risk insurance policy which was to cover all the contractors and subcontractors. In relevant part, those provisions are as follows:

"21. Delete subparagraph 11.1.3 in its entirety and substitute the following:

11.1.3 The Certificate of Insurance acceptable to the Owner shall be filed in duplicate with the Architect. The Certificate of Insurance shall have the indemnification agreement typed on the back. Insurance shall be written with a company having a Best Insurance Guide Rating of AAAAA A Plus.

11.1.3.1 The Contractor and/or any of his subcontractors shall not commence work at the site under this Contract until he has obtained all required insurance and until such insurance has been approved by the Owner and Architect. Such approval shall not relieve or decrease the liability of the Contractor hereunder.

11.1.3.2 The Contractor shall not cause any insurance to be cancelled nor permit any insurance to lapse. All insurance policies shall include a

clause to the effect that the policy shall not be cancelled or reduced, restricted or limited until fifteen (15) days after the Owner and Architect has received written notice as evidence by return receipt of registered or certified letter.

11.1.3.3 The above required Certificates of Insurance shall contain transcripts from the proper office of the insurer, evidencing in particular those insured, the extent of the insurance, the location and the operations in which the insurance applies, the expiration date, the above-mentioned notice of cancellation clause, the above-mentioned contractual liability coverage, and the name and address of the issuing agent.

22. Property Insurance: Amend subparagraph 11.3.1 as follows:

Property Insurance as described in Paragraph 11.3.1 shall be purchased and maintained by the General Contractor. This insurance shall be in effect prior to time when construction materials will be placed on the site or sites. The Policy required will be a Fire and Extended Coverage Insurance Policy, to which is attached a Builder's Risk Completed Value Form No. 17-C and a Vandalism and Malicious Mischief Insurance Endorsement Form No. 205 for 100% of all construction contracts. The Insurance shall be written with a company having a Best Insurance Guide Rating of AAAAA A Plus.

✿ ✿ ✿

24. Delete subparagraph 11.3.3 in its entirety and substitute the following:

Any loss is to be made adjustable with and payable to the Owner, Contractor, subcontractors, and Material Dealers as their interests may appear at time of loss. The Owner and the Contractor shall be named in the policy.

25. Delete Subparagraph 11.3.4 in its entirety and substitute the following:

Before an exposure to loss may occur the respective contractors shall file a copy of all policies with the Owner and the Architect.

✿ ✿ ✿

27. Delete subparagraph 11.3.6 in its entirety and substitute the following:

The Owner, the Contractor and all Subcontractors waive all right of action, each against the others, for damages caused by fire, or other perils covered by Insurance provided for under the terms of this Contract, except such rights as they may have to the proceeds of insurance held by the Contractor as trustee.

✿ ✿ ✿

29. Add the following to Paragraph 11.3:

11.3.9 This Policy and all its endorsement shall include the following special provision which shall be stated on the Certificate of Insurance:

11.3.9.1 If this Policy is cancelled during its term, be in danger of

expiring, or the coverage afforded by it is reduced, the insurer will mail, by certified post, notice 15 days before the effective date of such cancellation or change to the State of Illinois Capital Development Board, 216 East Monroe Street, Springfield, Illinois 62701."

S.M. Wilson & Company did furnish a builder's risk insurance policy, but the policy named only S.M. Wilson & Company as the insured. After the fire and upon discovering it was not named as an insured, the Claimant filed suit against S.M. Wilson & Company and the insurer, claiming S.M. Wilson & Company was negligent in failing to have Claimant added as a named insured and claiming that the policy, although not expressly naming the Claimant, was in fact intended to cover the Claimant. The same insurer had both S.M. Wilson's liability policy and the builder's risk policy. The matter was settled for $5,250 which the Claimant acknowledges must be set off against its alleged $10,500 loss.

It is Claimant's position that the CDB, as owner, had an implied duty to see that the insurance policy furnished by S.M. Wilson & Company covered all of the other contractors, as required by the contract, and breached that duty in failing to do so. We agree. We think that the Claimant had a right to rely on the terms of the contract. The CDB was the owner of the project and had ultimate control over the project. Under the terms of the contract, the certificate of insurance had to be acceptable to the CDB. It had to be filed with the CDB's architect. The work was not to have begun at the site until the insurance was approved by the CDB and the architect. If the policy was unacceptable to the CDB, Claimant should have been prevented from starting its work. We do not accept the Respondent's argument that the loss was the Claimant's own fault because Claimant failed to check on the coverage. It was not Claimant's responsibility.

Nor do we accept the Respondent's argument that the Claimant failed to exhaust its remedies as required by section 25 of the Court of Claims Act (Ill. Rev. Stat., ch. 37, par. 439.25). The argument is that Claimant should have fully litigated its suit against S.M. Wilson and the insurer. Respondent opines that the Claimant had a strong case and could have obtained full recovery. We do not deem it necessary to process claims through trial in order to meet the exhaustion of remedies requirement. (*Dellorto v. State* (1979), 32 Ill. Ct. Cl. 435.) Respondent's assertions to the contrary, we do not think the legislative intent was to require claimants to pursue every remedy to judgment or, perhaps, beyond through the various stages of appeals, nor do we think it good policy to require such. We think that a claimant has sufficiently exhausted a remedy if the settlement appears reasonable under the circumstances and there is no showing of fraud or collusion. The settlement appears reasonable. After reducing the $10,500 by the settlement and allowing only 10% for overhead, we find Claimant's damages, to be $4,725.

Next, the Claimant seeks extra compensation for the installation of what the parties call the "service entrance." In the industry, the conductors or wire between the electrical power source and the metering device is known as the service entrance. It is Claimant's contention that the installation of the service entrance was not Claimant's responsibility according to the specifications. The Claimant was directed by the CDB to install the service entrance and did so. Claimant submitted a request for a change order seeking additional compensation but the request was refused on the grounds that the work was included in the specifications as part of the electrical contract. Claimant kept separate records of its costs and seeks $26,661.22 of

which approximately 70% was for materials and 30% for labor.

In support of its position, Claimant submitted an affidavit from its expert, James Fowler, president of J.F. Inc. In support of its contention that the plans called for the Claimant to do the work, the Respondent submitted an affidavit from its expert, Joseph B. Summers. Their conclusions are contradictory. However, the record does indicate that Mr. Fowler thought that there was an ambiguity in the plans before he bid the project for the Claimant. His affidavit states that an issue in most electrical construction contracts is whether the responsibility for the service entrance conductors is that of the public utility or that of the electrical contractor. He further stated that J.F. Inc. always checks the plans and specifications and, if necessary, checks with the public utility to clarify the issue before submitting its bid. In this case he did check with a public utility. He stated that prior to bidding the project he telephoned Illinois Power Company and received confirmation that Illinois Power Company would provide the service entrance conductors and as a result did not include that cost in his bid. His affidavit also states that Henry Morgan, an electrical inspector for the CDB, contacted Illinois Power Company and confirmed that it would have done the installation and that Mr. Morgan also checked the bid and estimate papers of J.F. Inc. and confirmed that the cost was not included in the bid. Ultimately, electrical power for the project was furnished by Union Electric Company, not Illinois Power Company, and Union Electric Company refused to do the work. We think Mr. Fowler should have known about this possibility. His affidavit states he was particularly familiar with electrical contracting customs, practices, and procedures in Madison County where the project was located

and further that the area was either on the borderline of the jurisdiction of the two public utilities or was in an area of dual jurisdiction. The record does not indicate if he contacted Union Electric Company. More importantly, thinking that there was an issue, he did not seek clarification from the CDB. We find in favor of the Respondent on this issue.

As for the next item for which Claimant seeks compensation, television conduit which was not specified but required as an extra, the Respondent stipulated at the hearing that the $1,020 claimed was owed.

Next, the Claimant seeks compensation for additional expenses incurred for the use of a helicopter to lift heating units from the ground to where they were to be situated on top of the building. James Fowler testified that the normal standard procedure for installing such units is to lift them onto the edge of the roof with a crane, setting it on planks to distribute the weight and then rolling them into place. He testified that he prepared his estimate on the assumption that his company would be allowed to set the units in place in this manner. When the time came to install the units he was denied permission to use that method of setting them in place by the architect. He could not recall the reason for denial of permisson and the record otherwise contains no indication of a reason. The Claimant then brought in a large crane which had to be assembled on location in anticipation of lifting the units from the ground, beyond the edge of the roof, to the center of the roof where they were to be installed. This crane was so large it could not be supported by the ground underneath and had to be disassembled and removed from the project. After making inquiries in St. Louis, Claimant located a helicopter in Atlanta, Georgia, and

had it flown in to airlift the units into place. Claimant was billed $10,500 for that service. He testified he had figured a cost of $8,000 in his bid to cover the locating of the units and the cost of the use of the two cranes exceeded that estimate. Claimant seeks $10,000 plus overhead and profit for a total claim of $12,500.

The Respondent asserted four defenses to this item of the claim. First, Respondent states that contract provides that the Claimant had to put the units in place. It did not provide how they were to be put in place and Respondent should not be responsible for more than the original contract price because the Claimant was unable to get the job done within the cost estimated. We do not accept this argument. The unrefuted testimony was that the Claimant had planned on using a method which was the usual and ordinary way. He was prevented from doing it that way by the architect. He was forced to use a different method which necessitated incurring more expense. No reason whatsoever for the refusal of permission was offered. Under the circumstances we think that it was incumbent upon the Respondent to offer a rationale for requiring the Claimant to proceed in an out-of-the-ordinary way or else bear the responsibility for the added cost.

The Respondent's second argument is that the Court should not condone the Claimant's trying different methods until it finds one that works and then billing the Respondent for costs in excess of the estimate. This argument is not supported by the facts. Claimant's portion of its bid which related to the placement of the units on the roof was $8,000. That estimate did not contemplate the second crane. Claimant does not seek recompense for it. Claimant is seeking the added expense incurred for doing the work in an out-of-the-ordinary way. Respondent has not suggested that the

way Claimant finally got the job done was inappropriate nor has Respondent suggested a less expensive way to have done it.

The third argument was that any damage suffered by the Claimant was occasioned by the architect. For reasons stated earlier, we do not accept this argument.

Fourth, and aside from the merits of this part of the claim, Respondent asserts there should be a setoff on the amount claimed. After performing the work at the site, the helicopter made an additional lift at another project of the Claimant which was underway at the same time. Respondent argues that there should be a credit for that work and because the Claimant did not offer evidence as to the value of that work, the Claimant failed in its burden of proof as to the damage and this item should be denied. However, Claimant's testimony was that the helicopter was brought in for the express purpose of this project. The additional job was close to the site and performed at no charge. But for the architect's refusal to permit the Claimant to proceed in the normal fashion, the helicopter would not have been rented, according to James Fowler.

We agree with the Respondent that there should be a setoff against the amount claimed for the value of the work done by the helicopter at Claimant's other worksite. The Claimant did receive something of value not related to the Respondent's project. We do not find the method of billing entirely persuasive. However, we do not think that this portion of the claim should fail for lack of specificity as to the value of the service. Damages are not rendered uncertain because they are uncertain as to the amount, as distinguished from those which are too uncertain to be recoverable because they are not the certain results of the wrong that has been

committed. (*Neylon v. State, supra; Harmon v. State* (1978), 32 Ill. Ct. Cl. 543; *Brewer v. State* (1975), 31 Ill. Ct. Cl. 104.) We know what Claimant was charged for the rental of the helicopter and ordinarily the burden of proving a setoff is on the defense. A setoff was proven but not as to a certain amount. As the triers of fact, we find that Claimant has been damaged in the amount of $5,000 plus 10% for overhead and 10% for profit for a total of $6,000.

Claimant's final item of damages sought, that of interest, is denied.

In summation, we find that the Claimant has suffered damages in the following amounts:

| | |
|---|---:|
| Electrical contract delays | $162,000.00 |
| Heating contract delays | 13,200.00 |
| Hy-plug terminators | 19,781.73 |
| Fire damages | 4,725.00 |
| Television conduit | 1,020.00 |
| Helicopter | 6,000.00 |
| Subtotal | $205,726.73 |
| Less recovery from architect | −8,000.00[1] |
| Total damages | $198,726.73 |

The question of entering an award remains. This Court cannot enter an award unless sufficient funds remained released and unexpended in the appropriation made to fund the project. (See discussion in *Loewen-*

---

[1] The Claimant received a jury verdict against the architect for $8,000 and acknowledged in its brief that it would be a setoff. What remains of that verdict after the appellate court's decision is unclear. Although the architect is named as an appellee in the reported decision, the decision itself only refers to the architect in passing. Throughout the decision the defendant was referred to in the singular and that defendant was S.M. Wilson & Company. When the parties were asked about what remained of the jury verdict at the oral argument, it appears that their responses were about S.M. Wilson & Company's portion of the judgment and nothing was said about the architect. We are assuming that the verdict against the architect remains intact. However, if it too was reversed and either party raises the matter in a motion for reconsideration within 30 days of the date of this opinion, we will reconsider this deduction.

*berg/Fitch Partnership v. State* (1986), 38 Ill. Ct. Cl. 227, 252-54, and *Ude, Inc. v. State* (1982), 35 Ill. Ct. Cl. 384.) Following the oral argument, Claimant presented the Court with fiscal year-end fund summaries for fiscal years 1974 through 1978. Construction on the project ceased and final acceptance occurred during August of 1976, but payments were made into fiscal year 1978. Fiscal year 1978 was the last year payments were made on the project. The fund summary for fiscal year 1978 indicates that $2,393.23 was left over and unobligated. An additional $100 was obligated for payment of this claim. Thus $2,493.23 remained available for the Court to award in damages. That money was in line item appropriation number 141-51101-4470-63-75. The fund summaries also indicate that there was shared funding for this project. The Respondent was responsible for 60% and the user school district was responsible for 40%. The school district's money was held in a State trust fund, No. 991-51101-1900-00-99, which is a nonappropriated account and was entirely expended by the end of fiscal year 1977.

For purposes of possible further legislative action, this Court finds that the Claimant has satisfactorily performed all of its obligations under the contract and has suffered damages in the amount of $198,726.73. Of that amount, we are constrained by operation of law to deny awarding all but $2,493.23 of those damages.

It is hereby ordered that the Claimant be, and hereby is, awarded the sum of $2,493.23.