(No. 83-CC-1569— )

LIPPERT BRICK CONTRACTING, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed May 30, 1991.*

*Order filed June 18, 1991.*

SAM S. PESSIN, for Claimant.

Roland W. Burris, Attorney General (William Webber, Assistant Attorney General, of counsel), for Respondent.

## OPINION

MONTANA, C.J.

The Claimant, Lippert Brick Contracting, brought this claim seeking $24,332.69 in damages incurred due to delays Claimant encountered in the performance of two construction contracts with the Respondent's Capital Development Board (hereinafter referred to as the CDB). The case was tried over many months by the Commissioner assigned to the case. The cause was consolidated for trial purposes only with claims by Guarantee Electrical Company, Lowry Electric Company, and K & S Associates, Inc.

In July and August of 1978, the CDB awarded two masonry contracts to Lippert Brick, a Delaware corporation, to perform masonry on the Skilled Training Center, Academic Building and Learning Resource Center of the East St. Louis Community College project. The Claimant, upon acceptance of its bid, was ready, willing and able to perform. The CDB in August of 1978 told the contractors to begin the project and authorized contractors to proceed. The project was to start August 30, 1978, and be finished in 730 days. In the contract documents, time was of the essence.

The plans and bid documents required the Claimant to start work on the Skilled Training Center on

February 23, 1979, and have completed its work on April 20, 1979. For the Academic Building, masonry was to start on April 20, 1979, and be completed on July 13, 1979. The masonry on the Learning Resource Center was to start on May 11, 1979, and be completed on August 10, 1979. Lippert Brick received notice of acceptance of its bid on the Skilled Training Center for $158,038.00 and the certificate of completion was to be before January 22, 1980. Claimant received notice of the award on the Academic Building and Learning Resource Center on August 1, 1978, and the final completion of the entire building was to be on August 1, 1980.

Lippert Brick completed its masonry work within the time frames (length of time) specified in the awards, being eight weeks for the Skilled Training Center, fourteen weeks for the Academic Building, and twelve weeks for the Learning Resource Center. However, the work was not completed during the dates as specified in the project manual. In actuality, Claimant started its work on the Skilled Training Center on August 28, 1978, and finished in May of 1980. On the Academic Building, actual masonry work commenced August 1, 1980, and was completed December 31, 1981.

It is apparent from the entire record that Lippert Brick caused no delays on this project. The CDB had the obligation to obtain an excavator to begin the project. The project was to start on August 30, 1978. The CDB was unable to obtain a qualified excavator and the excavation was still incomplete over a year after the project began. The CDB's utter failure to have the excavation start on time and continue as a major problem for over a year was one of the two major delays on the case. Because of the excavation problem, all of the project schedules were off from day one. This had a

snowball effect as the delay caused the project to go through four winters rather than the scheduled two winters. Once the project was delayed by the excavation problem, all of the coordination and sequencing was out of sync and the architect/engineer and general contractor were not able to get the project back in sync.

Lippert Brick did everything it could do. They notified the CDB of the delays due to no excavation and the problems of not being able to work outside in the winter and the problems of no heat in the Skilled Training Center. The CDB was unable to clear up these problems and the project was delayed almost two years beyond its scheduled completion date for the entire project.

Because of the delays caused by CDB, the architect/engineer, and the general contractor, Lippert Brick encountered increased union wages which were not included in their bid. The bid of Lippert Brick was made pursuant to the plans and specifications of the project. The Claimant proved increased costs for the Skilled Training Center of $3,049.00 for bricklayers due to the delays which all can be attributed in the first instance to the CDB's failure to have the site excavated. A building cannot be built until the hole is dug for the pilings and foundation and the earth compacted. This major delay got the project off to a horrendous start that the architect/engineer and general contractor were incapable of solving. The increase was due to a $.55 per hour increase as of September 1, 1979, for bricklayers and as of August 1, 1980, an increase of $1.65 per hour. The other wage increases were proven by exhibits of Claimant.

On the Academic Building and Learning Resource Center, the increase for bricklayers was $10,104.60, for

hodcarriers $5,328.75, and for equipment operators $975.80, for a total of $16,409.15. Lippert Brick also claims $4,874.54 for insurance, overhead, and profit. The total damages claimed are $24,332.69.

The testimony is devoid of any blame for delay on Lippert Brick. They caused no delays. In fact, Lippert Brick even did some of their own grading to set up staging which was not their task. They did so however to speed up the masonry work. This project was unusual in that the CDB usually has five prime contractors. In the instant case, they had 36 prime contractors. The contracts were broken down into small contracts so that minority contractors could be used. Such a situation required great coordination skills which were not apparent in the CDB, the architect/engineer, and the general contractor. Once the excavation did not proceed as scheduled, the entire project was ill-fated. The CDB failed to take appropriate steps to obtain a competent excavator and the project suffered. CDB officials admitted it was their obligation to obtain an excavator.

Lippert Brick sued K & S Associates, Inc. in the circuit court of Illinois but dismissed their suit. Lippert's position was that their contract was with the CDB and not with K & S. Therefore, the proper venue was the Court of Claims. As will be discussed later, Claimant had no obligation to sue K & S and this claim is properly before the Court of Claims. There was considerable testimony and fingerpointing in the joint trial as to the cause of the delays. Other opinions will deal in more detail as to the cause of the delays and liability therefore, but suffice it to say that Lippert Brick was not a cause of the delay. The CDB was a major cause of the delay in allowing the excavation problem to continue so long, having an architect/engineer not up to the job, and

failing to terminate K & S Associates, Inc. when it became painfully obvious that the general contractor could not sequence the job once it got off to the bad start. CDB also had at least five project managers over the course of the project for various reasons which contributed to the delays.

It is obvious that the Claimant could not proceed with its masonry work until certain other phases of the construction were completed. There was evidence that the Claimant notified the CDB in writing that delays were occurring and costs were mounting. On April 30, 1979, the CDB was warned by Lippert Brick of the impending wage increases. Other letters by Lippert document the delays and cost increases.

Claimant's contract was with the CDB. The CDB has the primary responsibility for making the work site available to the contractor in time for the contractor to do the work. As owner, the CDB is legally liable for the contractor to do the work. As owner, the CDB is legally liable for the delays and resulting damages. The fact that the CDB separately contracted with other entities who may be to blame for the delays is of no consequence in this action. If the CDB is damaged by the actions it attributes to others, it may pursue those it believes caused the damage. Under circumstances as are involved here, where all the parties to the contract cannot sue each other in one forum, this result must obtain. The appellate court stated in *J.F. Inc. v. S.M. Wilson & Company* (1987), 152 Ill. App. 3d 873,

"This court finds that if the owner failed to make the site available to the contractor in time for the contractor to do its work, the contractor may sue the owner. (See *W.H. Stubbings Co. v. Worlds Colombia Exposition Co.* (1903), 110 Ill. App. 210.) In this case, the prime contractor may sue the State in the Court of Claims (Ill. Rev. Stat. 1983, ch. 37, par. 439.1 *et seq.*) for its failure to properly supervise the construction project. (Ill. Rev. Stat. 1985, ch. 127, par. 780.04). Even if the contract contained a no damage for delay

provision, a prime contractor may sue and recover from the owner for delay damages caused by another prime contractor. (*United States Steel Corp. v. Missouri Pacific R.R. Co.* (1982), 668 F.2d 435.) Thus, the appropriate procedures for a prime contractor are change orders and possible lawsuit in the Court of Claims."

Most if not all construction projects will have delays of one form or another. Those projects with multiple contractors calling for coordinated efforts are more likely to have delays. The East St. Louis Community College project had thirty-six prime contractors when the usual project had just five. For a delay to be tolerated, it must be reasonable under the circumstances. The delay on this project was considerable and certainly beyond reasonable. The CDB has tried to put the blame on the other contractors but has shown absolutely no excuse for the initial cause of the delay, the lack of an excavator on the project.

The Respondent defends by arguing that the starting and completion dates were provisional and did not impose a duty upon the owner to ensure completion by August of 1980. It cites *Edwards Construction Co. v. Illinois State Toll Highway Authority* (1975), 34 Ill. App. 3d 939. The *Edwards* court held that the owner was not liable for delays caused to a second phase contractor on the basis of a schedule that did not afford the plaintiff a prepared work site upon which to perform. The court held that the contract provided a completion date which was provisional and did not impose a duty upon the owner to ensure completion by that date.

In the present case, the entire project was to take 730 days. The project lasted almost four years. The CDB gave authority to proceed in early August of 1978. In bidding the contract, the Claimant only had the completion date to work backward from or a general estimate of when the work of the other contractors

would be completed to arrive at an expectation of a starting date. With an actual starting date in August of 1978, the actual delays on the project greatly exceeded anything foreseeable or reasonable. Furthermore, adjustments could not be made as the project very slowly progressed because the work schedules were never realistic and seldom produced by K & S, the general contractor. Eventually the architect/engineer had to take over the coordination because K & S could not do the job.

Because Respondent started the job in August 1978, and because there was an outside completion date, Respondent's argument in the face of the unreasonable delays is without merit. The Respondent has the responsibility for the damages sustained by this Claimant due to the delays. The State's recoupment action against K & S is the subject of another opinion. Claimant presented testimony that its losses were not related to costs of materials but to labor costs. Claimant provided sufficient evidence that its actual labor costs exceeded its estimated labor costs on both contracts for a total of $19,458.15. Claimant added on $4,874.54 for taxes, insurance, overhead and profit. Claimant's Exhibit No. 13 was a letter from Ralph Igo, a senior official of the CDB, which acknowledged Lippert's claim and complimented Claimant on the fairness of the claim. The letter exhibit closes by Ralph Igo saying to Claimant, "of all the claims received, my personal belief is that yours was prepared by an honest person and I hope I can be of some assistance in seeing you are treated fairly." This exhibit was dated January 23, 1984. The increased labor rates were attributed to wage rate increases due to the project going beyond the original 730-day completion schedule.

The Respondent contests Lippert's claims for profits citing *Egizii Electric v. State* (1973), 32 Ill. Ct. Cl. 93. *Egizii, supra,* does not stand for the proposition espoused by Respondent. The case states that "where a party to a contract has caused a breach, that party is liable for the increased costs and damages directly and proximately caused by such breach." The State stipulated to the damages in that case and profits were not an issue. The Court of Claims has awarded damages for profits and overhead in delay cases at 10%. (*J.F. Inc. v. State* (1988), 41 Ill. Ct. Cl. 5.) Overhead and profit are appropriate measures of damages and the Court will allow 15%.

The damages proven by Claimant for increased wages paid, overhead, taxes and profits were reasonable with overhead and profit limited to 15%.

In summation, the Claimant has suffered damages in the following amounts:

## Skilled Training Building

| | |
|---|---|
| Bricklayers, 2819 hours at $.55 per hour | $ 1,550.45 |
| Hodcarriers, 1763 hours at $.85 per hour | 1,498.55 |
| Fifteen percent insurance, taxes, overhead & profit | 457.35 |
| Total | $ 3,506.35 |

## Academic & Learning Resources Center

| | |
|---|---|
| Bricklayers, 4593 hours at $2.20 per hour | $10,104.60 |
| Hodcarriers, 3045 hours at $1.75 per hour | 5,328.75 |
| Equipment operators, 574 hours at $1.70 per hour | 975.80 |
| Fifteen percent for insurance, taxes, overhead, and profit | 2,461.38 |
| Total | $18,870.46 |
| Total for both contracts | $22,376.81 |

Two questions remain. The Respondent raises the public policy issue that the actions of the State to try to keep Eanes Excavation on the job as a minority contractor was an important goal and this excuses the State from delay claims caused by this important public service. The argument is that a public policy goal was minority business participation in State contracts. In this case, Eanes Excavating could not obtain a performance bond. Later, working under a change order through K & S, the general contractor, it became obvious that Eanes could not do the job. The Respondent argues that the CDB took its actions to try to keep the minority contractor working for good cause and its actions were consistent with a strong public policy, and that to penalize the State for adherence to this societal goal would effectively contravene public policy. Even if it is assumed that this is a valid defense, and we do not find that it is, we are not convinced that the goal could not have been met with other means. While the goal was laudable, these contractors should not be the sole bearers of the cost of reaching it. The only ones penalized here are a few contractors who the State wants to be left holding the bag. These contractors continued to work on the word of the CDB officials that they would be treated fairly. The State cannot be penalized because it is not the State's money that will be used to pay Claimant. The money comes from all the taxpayers in the State. If anyone should be "penalized" as Respondent suggests, then all the people should pay to spread the cost to all taxpayers for the public purpose.

Finally, the question of entering an award remains. This Court cannot enter an award unless sufficient funds remained released and unexpended in the appropriation made to fund the project. See discussion in *Loewenburg/Fitch Partnership v. State* (1986), 38 Ill. Ct. Cl. 227

and *Ude, Inc. v. State* (1982), 35 Ill. Ct. Cl. 384. The transcripts in these joined cases are in excess of 3100 pages. The exhibits number in the hundreds and include hundreds if not thousands of pages of information related to the cases. In the Court's review of the testimony and exhibits, no concrete evidence is found concerning any exact amounts of released and unexpended funds from the project. There is some evidence, although it appears to be hearsay, that the State was to fund 75% of the project and the user, East St. Louis Community College, was to fund 25%. Local funding had been an initial problem which caused the project a late start on bidding to the summer of 1978. There was also some testimony by CDB officials that there was no money available to pay any delay claims and that no delay claims were ever paid on this project. There was also some testimony about a contingency fund but nothing concrete enough for the Court's purposes.

Before entering judgment for the Claimant or making a recommendation to the General Assembly, we will need the fiscal data including the balance of released funds which lapsed at the conclusion of the project. Respondent is ordered to file said information within 14 days.

## ORDER

These cases come on to be heard following the Respondent's response to the opinions entered herein on May 30, 1991, and the Court being advised;

In the aforementioned opinions the Court found that each of the Claimants suffered damages but refrained from actually awarding the damages pending the Respondent's submission of the fiscal data on the remaining balances of funds appropriated for the two

projects. The Respondent has promptly complied with the directive and the claims are again before us.

The Respondent's reply is accepted as *prima facie* evidence of the facts contained therein pursuant to 74 Ill. Adm. Code 790.14. Respondent stated that a total of $19,879.00 lapsed in Appropriation Account Code Number 141-51184-4470-28-78 for CDB Project Number 810-029-001, the East St. Louis Junior College and VoTech. On the Community College of East St. Louis project, No. 810-092-001, the Respondent stated that $88,762.62 lapsed in three separate Appropriation Account Codes, 141-51184-4470-28-78, 141-51184-4470-60-75, and 141-51184-4470-60-79. One Appropriation Account Code, 141-51184-4470-28-78, is listed under both projects. This appears to be an artificial separation made by the CDB. In appropriating funds for the project the General Assembly apparently did not so designate the money or else it would have made separate appropriations. The Court sees no reason that this money should not be comingled. However, an insufficient amount of funds lapsed to cover all of the damages.

As indicated in the prior opinion, it is this Court's policy in breach of contract claims to limit awards so as not to exceed the amount of funds, appropriated and lapsed, with which payment could have been made. To do otherwise, *i.e.*, to award money for debt incurred beyond the sum allotted by the General Assembly, would be tantamount to granting a deficiency appropriation. The appropriation of State funds is the constitutional prerogative of the General Assembly. It is the Court's duty to uphold that process. It is also the Court's duty to advise the General Assembly. (*Thorlief Larsen & Son, Inc. v. State* (1990), 42 Ill. Ct. Cl. 195; *Bojko v. State*

(1988), 41 Ill. Ct. Cl. 202; *J.F. Inc. v. State* (1988), 41 Ill. Ct. Cl. 5; *Loewenberg/Fitch Partnership v. State* (1986), 38 Ill. Ct. Cl. 227; *Ude, Inc. v. State* (1982), 35 Ill. Ct. Cl. 384.) Further, where there are several Claimants vying for the same lapsed funds and an insufficient amount lapsed to cover *in toto* all of the damages suffered, it is this Court's policy to make awards on a first in first out (FIFO) basis. *Thorlief Larsen & Son, Inc. v. State supra* (1990); *Board of Trustees of Southern Illinois University v. State* (1988), 40 Ill. Ct. Cl. 146; *Aurora College v. State* (1985), 37 Ill. Ct. Cl. 321.

Among the four claims at bar, that of Guarantee Electrical Company was filed first. Guarantee suffered damages totalling $269,052.00 as a result of contract breaches on CDB Project No. 810-092-001 only. The total amount of lapsed funds on that project was $88,762.52. As previously pointed out, the lapsed funding for the other project should also be considered because it is one and the same appropriation. The $19,879.00 will be added for a total award to Guarantee of $108,641.62.

The allocation of all of the lapsed funds to Guarantee on the FIFO basis renders moot which contractor filed next as the funds are exhausted.

For purposes of potential consideration of these four claims by the General Assembly and in fulfilling our role as an advisory body to the General Assembly we reiterate our finding in the prior decisions and point out that but for the insufficient amount of lapsed appropriations on this project we would have made the following awards of damages:

1. Guarantee Electrical Company—$160,410.38 (over and above the award to be made hereinbelow)

2. Lowry Electric Company—$18,975.00
3. Lippert Brick Contracting—$22,376.81
4. K & S Associates, Inc.—$264,137.56

Accordingly, it is hereby ordered that Guarantee Electrical Company be, and hereby is, awarded the sum of $108,641.62 and the other claims are denied solely for the reasons stated herein.