(No. 84-CC-0588—)

K & S Associates, Inc., Claimant, *v.* The State of Illinois, Respondent.

*Opinion filed May 30, 1991.*

*Order filed June 18, 1991.*

*Amended order filed November 14, 1991.*

Tom Hennessey, for Claimant.

Roland W. Burris, Attorney General (William Webber, Assistant Attorney General, of counsel), for Respondent.

## OPINION

MONTANA, C.J.

The Claimant, K & S Associates, Inc., brought this claim on January 4, 1984, seeking $476,110.50 in

damages incurred due to delays and other problems Claimant encountered in the performance of a construction contract with the Respondent Capital Development Board (hereinafter referred to as the "CDB"). The case was tried over many months by the Commissioner assigned to the case. The cause was consolidated for trial purposes only with claims by Lippert Brick Contracting, Lowry Electric Company, and Guarantee Electrical Company.

Claimant makes the following claims against the State: a lapsed appropriation claim; a claim for reimbursement for money paid by Claimant to an excavator; a claim for excessive layouts; a claim resulting from lack of security at the site; a claim for consumables; a claim for additional labor resulting from roofing delay and water leaks in connection with the roof construction on the Academic Building and Learning Resource Center; a claim for metal siding for walkways; a claim for end-splash and support; a claim for expansion joint covers on the Academic Building and Learning Resource Center; a claim for additional lintels due to architectural error; a claim for aluminum thresholds; a claim based on the mop-up of the coal-tar buildups on the center section roof of the Skilled Training Center; a claim for sandblasting and painting of metal decking; a claim for security losses at the Skilled Training Center; a claim based on window water leaks caused by the CDB's failure to properly administer the glazing contract; a claim for extra labor and material due to water penetration because of a lack of the center section roofing; and a delay claim.

The State countered in this lawsuit with a recoupment action against this Claimant. Each claim of the Claimant will be discussed separately and in light of the State's recoupment claim.

On August 1, 1978, the CDB entered into contracts with Claimant in which Claimant agreed to be the general contractor in the construction of the three buildings in the East St. Louis Community College project. The project consisted of the Skilled Training Center, the Academic Building, and the Learning Resources Center. Claimant also was awarded a separate contract for the roofing of the Skilled Training Center. The project was scheduled to begin on August 30th of 1978 and be completed in 730 calendar days and by August 30, 1980. Time was of the essence in the contract documents. The CDB gave Claimant bid documents and drawings upon which Claimant testified it relied in computing its bid and planning its work. With these documents and using the customary construction and bidding practices, Claimant's bid was $1,182,000.00. Claimant attached a bid addendum to its bid which limited some of its duties. The bid addendum was accepted by the State although to do so was contrary to State policy.

In fact, the project was finally completed on December 16, 1982, with final acceptance on June 24, 1983. Claimant alleged that it was prevented from completing its work within the contractual 730 days due to delays not attributable to Claimant and that Claimant incurred actual costs of $450,603.50.

The Claimant, upon acceptance of its bid, was ready and willing to perform. The CDB, on August 30, 1978, told the Claimant to begin the project and authorized the Claimant to proceed. The initial problem to occur which caused the major delay was the inability of the CDB to obtain an excavator for the project. The excavation contract involved the clearing, grading and excavation necessary to complete the project. A prime

contract was originally awarded to Eanes Excavation Company. Eanes was unable to obtain a performance bond as required. Rather than terminate the excavating contract with Eanes, the CDB requested Claimant to subcontract the excavating work to Eanes through Claimant. Although this was tried, it became obvious Eanes was incapable of performing the required excavation work. In March of 1979, the CDB indicated it would seek a new excavator.

On May 1, 1979, East St. Louis Equipment and Leasing submitted a bid for the excavation work. This excavator underestimated the work on its bid, requested more money, and was not paying its workers which resulted in the threat of a union shutdown. The CDB requested Claimant to pay this excavator more money to keep the project going. Other difficulties between the CDB and East St. Louis Equipment and Leasing led the new excavator to leave the job. The CDB had the obligation to obtain an excavator to begin the project. The project was to start on August 30, 1978. The CDB was unable to obtain a qualified excavator and the excavation was still incomplete over a year after the project began. The CDB's utter failure to have the excavation start on time and continue was a major problem for over a year and was the major delay on the project. Because of the excavation problems, all of the project schedules were off from day one. This had a snowball effect as the delay caused the project to go through four winters rather than the scheduled two winters. Once the project was delayed by the excavation problem, all of the coordination and sequencing was out of sync and the architect/engineer ("A/E") and the Claimant, the general contractor, were not able to get the project back in sync.

Other acts of the CDB caused substantial delays on this project. The normal CDB project has five prime contractors. The East St. Louis Community College project was broken down to have 36 prime contractors by CDB to obtain minority participation. CDB officials acknowledged that this number of contractors required increased coordination which the A/E and general contractor chosen by CDB were unable to perform. CDB did nothing to rectify the inept coordination even after it was apparent the A/E and general contractor were not up to the job.

Dennis Larson, the last of five project managers for the CDB, found the CDB at fault for delays at least in four major instances: (1) Breaking the projects down into multiple contracts. There were 36 total prime contractors. While the idea was to obtain minority participation, the idea backfired as one company, J. J. Altman & Company, was awarded many of the general-type work contracts. The coordination of so many contracts was very difficult; (2) The acceptance of K & S Associates bid attachments and subsequent award of general work contracts to K & S created many contractor responsibility disputes. Previous CDB legal decisions stated CDB did not accept qualified bids. However, CDB did accept this qualified bid; (3) The initial site excavation contract was mishandled. The CDB proceeded with issuing change orders to the general contractor which created payment and performance problems; (4) A delay was experienced over CDB's decision concerning what roofing system would be acceptable in the flat section of the Skilled Training Center roof. The problem was noted in the A/E minutes of November 1979; however, a direction to the contractor was not given until March of 1980. This caused delay.

The A/E also caused delay. CDB officials considered the A/E construction documents prepared by the A/E as poor at best. Timely processing of paperwork was another cause of delay attributable to the A/E.

However, this Claimant was also accountable for substantial delays. Once the excavation delay put the project off to a bad start, K & S lacked the ability to coordinate and schedule the project to get it back on track. The Claimant's inability to provide realistic schedules for the work process dictated the CDB giving the A/E responsibility for job sequencing on August 27, 1980. The A/E and John Kraska of Claimant appeared to have a personality conflict which also did not aid the orderly completion of the work. Other documented delays by K & S are as follows: coordination of subcontractors and prime contractors of K & S was a problem throughout the construction. The project layout by K & S caused delays in the structural concrete work. The slow steel erection by K & S's subcontractor, Milner Steel, delayed the masonry start. There was a dispute over K & S not maintaining adequate heat in the building in the winters of 1980 and 1981. K & S's removal of their trailer from the site in February of 1982 caused a lack of coordination on the punch-list work that remained to be done.

There were other delays where the blame is shared. The structural steel did not go up in time. The building was not enclosed on schedule so that during the second winter the electricians could not work. There was no steel decking on the second floor and roof which caused delays. There was no heat, ice was on the floors, and the building was not weathertight, all of which caused delays. Also, there was no proper sequencing of the trades or proper coordination. Paperwork was not

timely processed. There were many CDB personnel changes as the CDB had five different project managers on this project. All of these factors also caused delays.

Once the excavation problems got the project off to a horrendous start, the compression of the schedule caused increased costs and because K & S, the general contractor, failed to provide realistic schedules on time, the sequencing was out of sync. Electricians, such as Guarantee Electrical and Lowry Electric, were at the mercy of the other trades. To be efficient, the electricians need to put in their conduit before other trades do their work. Here the scheduling was so bad that Guarantee and Lowry were prohibited from efficiently doing their work.

With the number of prime contractors on this project, coordination meetings should have been held more often than once a month. The CDB was to have people at the meetings with authority. The project managers did not have authority to act on the questions raised at the coordination meetings. Often no decisions were made for months.

The majority of the preceding delays and particularly the excavating delays are attributable to the CDB. The A/E caused delays by failing to get shop drawings to the contractors on time. Six months after the job was to have started, they were still calling for shop drawings. Of the remainder of the delays, a substantial portion are attributable to the Claimant, the general contractor K & S Associates, Inc.

Some small delays were attributable to other prime contractors.

### The Delay Claim

Claimant seeks monetary damages for costs

incurred after the contractually scheduled completion date. The Skilled Training Center was to be completed by January 23, 1980. The building, in fact, was not completed until the spring of 1982. The Academic Building was to be completed by August 1, 1980, but wasn't completed until the summer of 1982. Claimant's Exhibits 212 and 214 suggest the delay costs sought by the Claimant for work on the Academic Building and Learning Resource Center and the Skilled Training Center, respectively. Damages of $129,992.00 are sought for the delay costs for the Academic Building and Learning Resource Center and damages of $162,774.00 are sought for the delay costs for the Skilled Training Center. These alleged damages are for the increased costs of carpenters, laborers, superintendents, clerical, management, material flows trailers, tooling, utilities, heating, insurance and equipment incurred by Claimant after the contractually scheduled completion date and which Claimant alleges would not have been incurred had the project been completed on time. Claimant also seeks delay costs of $4,559.00 attributable to the separate roofing contract on the Skilled Training Center and Claimant's Exhibit 217 is used by Claimant to substantiate its claim.

Most if not all construction projects will have delays of one form or another. Projects with multiple contractors calling for coordinated efforts are more likely to have delays. The East St. Louis Community College project had 36 prime contractors when the usual project has just five. For a delay to be tolerated, it must be reasonable under the circumstances. The delay on this project was considerable and certainly beyond reasonable. The CDB has tried to put blame on the Claimant and other contractors but has shown abso-

lutely no excuse for the initial cause of the delay, the lack of an excavator on the project.

The Respondent defends by arguing that the starting and completion dates were provisional and did not impose a duty upon the owner to ensure completion by August of 1980. It cites *Edwards Construction Co. v. Illinois State Toll Highway Authority* (1975), 34 Ill. App. 3d 939. The *Edwards* court held that the owner was not liable for delays caused to a second phase contractor on the basis of a schedule that did not afford the plaintiff a prepared work site upon which to perform. The court held that the contract provided a completion date which was provisional and did not impose a duty upon the owner to ensure completion by that date.

In the present case, the entire project was to take 730 days. In fact, the project lasted almost four years. The CDB gave authority to proceed on August 30, 1978. In bidding the contract, the Claimant only had the completion date to work backward from or a general estimate of when the work of the other contractors would be completed to arrive at an expectation of a starting date. With an actual starting date in August of 1978, the actual delays on the project greatly exceeded anything foreseeable or reasonable. The appellate court stated in *J.F. Inc. v. S.M. Wilson & Co.* (1987), 152 Ill. App. 3d 873,

"This court finds that if the owner failed to make the site available to the contractor in time for the contractor to do its work, the contractor may sue the owners. (See *W.H. Stubbings Co. v. Worlds Colombia Exposition, Co.* (1903) 110 Ill.App. 210. In this case, the prime contractor may sue the State in the Court of Claims (Ill.Rev.Stat., 1983, Ch. 37, par. 439.1 *et seq.*) for its failure to properly supervise the construction project. (Ill.Rev.Stat. 1985, Ch. 127, par. 780.04.) Even if the contract contained a no damage for delay provision, a prime contractor may sue and recover from the owner for delay damages caused by another prime contractor. *United States Steel Corp. v. Missouri Pacific R.R. Co.* (1982), 668 F.2d 435. Thus, the appropriate procedures for a prime contractor are change orders and possible lawsuit in the Court of Claims."

Because Respondent started the job in August 1978, pursuant to an authorization to proceed, and because there was an outside completion date, Respondent's argument in the face of the unreasonable delays is without merit. The Respondent has the responsibility for some of the damages sustained by this Claimant due to the delays. The State's recoupment action against K & S will be discussed later in this opinion. Because Claimant was responsible for substantial delay because of its inability to fulfill its coordination duties under the contracts, such culpability must be considered in determining damages. In addition, the damages to Claimant are difficult to asertain with exactitude. Claimant testified and presented sufficient evidence that its actual labor costs exceeded estimated labor costs. The labor and material delay costs sought by Claimant are as follows:

Academic Building and Learning Resource Center

*Labor*

| | |
|---|---|
| Carpenters | $ 7,500.00 |
| Laborers | 3,800.00 |
| Superintendents | 3,900.00 |
| Clerical | 1,560.00 |
| Usage Superintendents | 19,500.00 |
| Usage Clerical | 13,182.00 |
| Usage Management | 15,600.00 |
| Laborers for clean-up | 4,000.00 |
| Loss of momentum | 6,000.00 |
| Losses due to redundant learning curves | 5,000.00 |
| Lack of orderly flow of material | 4,000.00 |
| Use of equipment | 14,400.00 |
| Utilities | 13,050.00 |
| Excessive temporary heating | 3,500.00 |
| Excessive replanning and scheduling | 2,500.00 |

| Escalation of material prices | 3,000.00 |
| Insurance | 1,500.00 |
| Board-up for weather protection | 3,000.00 |
| Cost of monies used ahead of change orders | 5,000.00 |

Of these damages claimed, there is insufficient evidence presented by Claimant to justify any award for loss of momentum, losses due to redundant learning curves, excessive replanning and costs of K & S money.

## Skilled Training Center

*Labor*

| Carpenters | $ 4,580.00 |
| Laborers | 3,343.00 |
| Superintendents | 5,000.00 |
| Clerical | 2,000.00 |
| Usage Superintendents | 30,500.00 |
| Usage Clerical | 20,618.00 |
| Usage Management | 24,400.00 |
| Laborers for clean-up | 3,000.00 |
| Loss of momentum | 5,600.00 |
| Losses due to redundant learning curves | 5,200.00 |
| Lack of orderly flow of materials | 4,000.00 |
| Extended use of K & S equipment | 21,650.00 |
| Utilities | 14,383.00 |
| Temporary heating | 3,000.00 |
| Replanning and rescheduling | 2,500.00 |
| Escalation of material prices | 2,500.00 |
| Insurance | 1,500.00 |
| Excessive temporary board-up | 3,000.00 |
| Cost of K & S money | 6,000.00 |

Of these damages claimed, there is insufficient evidence presented by Claimant to justify any award for loss of momentum, losses due to redundant learning curves, excessive replanning, and costs of K & S money.

## Separate Roofing Contract

*Labor*

| | | |
|---|---|---|
| Roofers | $ | 560.00 |
| Laborers | | 300.00 |
| Superintendent/clerical | | 150.00 |
| Usage of clerical | | 300.00 |
| Supervision | | 600.00 |
| Loss of momentum | | 400.00 |
| Losses due to redundant learning curves | | 400.00 |
| Lack of flow of materials | | 300.00 |
| Use of equipment | | 400.00 |
| Escalation of material prices | | 800.00 |
| Insurance | | 349.00 |

Claimant presented insufficient evidence to justify any award for loss of momentum and losses due to redundant learning curves.

There was testimony that the original bid was reasonable. The increased labor costs were attributed to wage rate increases, loss of efficiency because of the necessity of stopping and starting work at various times, and the need to have supervisory personnel on or following the project for almost four years rather than the 730 days. The material increases were attributed to cost increases and storage.

With the unknown variable of an exact known starting date at the time of the bid, the fact that some delay is inevitable, and the inherently speculative nature of computing loss of efficiency, along with the substantial delays caused by Claimant, we find the losses occasioned by delay for insurance, equipment, utilities, labor and material costs as heretofore stated to be $50,000.00. Admittedly this figure is somewhat arbitrary and the delays were primarily the responsibility of the

Respondent but we do not believe that the damages are computable down to the penny as Claimant has tried to show. As triers of fact, it is the Court's responsibility to arrive at an amount after weighing the evidence. (See *Neylon v. State* (1985), 39 Ill. Ct. Cl. 65.) We believe that the foregoing finding represents a fair amount. This amount takes into account the aforesaid variables and Claimant's culpability in the delays. Of course, the State's recoupment action would have an effect on the amount of any award.

## The Lapsed Appropriations Claim

The State has acknowledged that Claimant is entitled to $46,204.09 for its lapsed appropriations claim subject to the State's recoupment action herein. However, we will need more information on this issue as will be noted later.

## The Claim for Reimbursement for Money Paid by Claimant to an Excavator

The project manager from the CDB directed Claimant to pay East St. Louis Community Equipment & Leasing, the second excavator, the sum of $18,584.08. This excavator had underestimated the job and was not paying his workers. A union had threatened to shut the entire project down. The CDB directed Claimant to pay the extra money to the excavator over Claimant's protest. At the time of the payment, the excavator was not due any further payment based upon the percentage of completion of its contract. The CDB advised Claimant they would be reimbursed for such payment in a matter of weeks. To date, Claimant has not been so reimbursed. Respondent failed to respond to this claim in its brief. Claimant is entitled to reimbursement of the

$18,584.08 paid by Claimant and with the allowable mark-up, Claimant is entitled to $26,369.00.

## The Claim for Excessive Layouts

Because of the excavation problems, K & S had to perform a number of layouts because the excavator failed to perform in a timely fashion and therefore Claimant's layout stakes would be removed or buried. Claimant complained to the CDB about this problem and incurred $3,500.00 in additional costs therefrom. The State did not argue against this claim in its brief.

## Claims Resulting from the Lack of Security at the Site

Claimant seeks damages for an alleged violation of a warranty on the part of the State as owner to keep the work site safe. East St. Louis at the time of construction was widely known to be a high crime area. The contract documents required Claimant to put up a construction fence. No other security was provided by anyone. Claimant argues that the State should have provided a night watchman and a guard dog. K & S suffered break-ins on December 10, 1979, March 3, 1980, May 4, 1980, May 19, 1981, and May 28, 1981. They also had vandalism problems on August 28, 1981, and a further loss of couplings not covered by insurance totaling $75.00. Total losses from theft and vandalism to K & S were $5,989.00. Claimant also seeks an additional $400.00 because it was required to store some materials off site to protect the materials. Claimant is not entitled to an award for its claim for lack of security at the site. The contract manual at page 01010-5, sec. 1.06(d) places the responsibility for such security on Claimant. Section 01630, paragraph 1.01(B) also states that the work includes an obligation on the part of each contractor to

provide and maintain storage for materials and equipment to be installed on project and protection for stored materials and equipment on and off site. This language is not so ambiguous as argued by Claimant and covers the losses as alleged by Claimant. In fact, most of the losses are insurance deductibles. Claimant therefore had insurance for part of these losses. Because Claimant had the obligation for security, its request for an award for damages for lack of security by the State is denied as the Claimant has failed to prove that security was beyond the basic requirements of its contract.

## The Claim for Consumables

Claimant attempts to create an ambiguity here where none exists. Originally the contract manual had a section for Temporary Utilities encompassing sections 1.04A and 1.04B. Section 1.04B was deleted by addendum 3.

Section 104 stated as follows:

"A. Installation, operation & maintenance
 1. Designated contractor pay all costs on installation, operation and maintenance of temporary utilities for designated time periods.
 a) Heating: *General Contractor* until substantial completion;
 b) Ventilation: *General Contractor* until substantial completion;
 c) Electrical system: *General Contractor* until substantial completion;
 d) Lighting systems: *General Contractor* until substantial completion;
 e) Telephone services: *General Contractor* until final completion;
 f) Water service: *General Contractor* until substantial completion;
 g) Toilets: *General Contractor* until substantial completion."
 (Emphasis added.)

The contract document and its language were not ambiguous. Contract obligations are determined from the plain wording of the contract. Here, early-on, Claimant knew that the State was holding Claimant responsible for all consumables. Payment for the consumables were a part of Claimant's basic contract. The documents

were sufficiently clear. Claimant has failed to prove this claim.

### The Claim for Additional Labor Resulting from Roofing Delay and Water Leaks on the Academic Building and Learning Resource Center

Co-Mac, a prime contractor, failed to provide the roofing for the Academic Building and Learning Resource Center in a timely fashion and water leaked into the building. Because there were no proper sewers, the water had to be mopped up and removed from the building. The delay in roofing was six to eight months. Claimant had to expend additional manpower to clean up and mop up the water due to Co-Mac's failure to perform for a total of $2,000.00 in damages. Claimant blames the CDB for failing to terminate Co-Mac and asserts that Co-Mac, as a prime contractor, was not subject to any penalties or action from Claimant to perform.

The Respondent asserts that the State was not to blame for Co-Mac's failure to perform and that Claimant was responsible for all scheduling, coordinating, and expediting of the work. However, only the CDB had the power to terminate a prime contractor.

The Respondent failed to use its power to push Co-Mac to work. Only the State's powers had adequate penalties behind them to force Co-Mac to work. Here the delay was caused by the State to a substantial degree and the contractor is entitled to damages of $2,000.00.

### Metal Siding for Walkways

Metal siding for walkways was not included in Claimant's bid on the Academic Building and Learning Resource Center. The CDB ordered Claimant to

perform the work over Claimant's protest. When the State modifies a contract, the Claimant is entitled to additional compensation. All of Claimant's claim will be allowed in the sum of $9,899.00. The CDB accepted Claimant's bid and must live with the consequences of those things not included in the bid.

### Claim for End Splash and Support

An error in a construction drawing indicated that a shelf was to be placed between two walls but failed to show any indication of a support for the shelf. Claimant was directed by the CDB to correct the error. The Claimant's extra work was due to the State's error in the plans and specifications and Claimant's claim for $310.50 should be allowed.

### Expansion Joint Covers in the Academic Building and Learning Resource Center

Here again, the specification for expansion joints was not included in Claimant's bid which was accepted by the CDB. The State did pay Claimant extra for expansion joint covers in the Skilled Training Center but refused to pay extra for the expansion joint covers in the Academic Building and Learning Resource Center. For the reasons heretofore stated, Claimant is entitled to $2,462.50 for performing additional work at the direction of the CDB based on inadequate specifications and drawings.

### Claim for Additional Lintels Due to Architectural Error

For the foregoing reasons, Claimant is entitled to $2,196.00 for this claim due to inadequate and conflicting drawings requiring Claimant to perform additional work at the direction of the CDB.

## Claim for Aluminum Thresholds

Claimant is entitled to $237.00 on this claim. The aluminum thresholds were not in its bid and were extra work due to poor drawings and specifications.

## Claim for Mop-Up of Coal Tar Buildup at the Skilled Training Center for the Center Section of the Roof

The project specifications outline two different roofing types for the center section of the Skilled Training Center roof. A disagreement developed over whether to use an expensive coal-tar buildup roof or a less expensive asphalt surface on the roof. The A/E took the position the coal-tar must be used. Claimant took the position that the specifications were not clear and the asphalt surface was an appropriate material under the specifications. Eventually the CDB, after a second review, adopted Claimant's position that the specifications were unclear as to what type roofing to use. The State did then advise Claimant that a coal-tar buildup surface was to be used and Claimant received a verbal authorization to proceed. The change order was not issued until four months later and for no explained reason was reduced over $7,000.00 below the agreed price for the coal-tar buildup.

The State later raised the amount they would pay by almost $4,000.00. The Claimant introduced evidence that the original agreed price was reasonable and the State does not argue this issue in its brief. Claimant is entitled to $3,261.00 on its separate roofing contract for the Skilled Training Center. Claimant also seeks $1,703.00 as a partial reinstatement of a reduction made in a change order as a result of the deletion of the requirement that K & S Associates supply a Lelotex guarantee on the center roof section. The guarantee had

been deleted as the State's project specifications failed to meet Lelotex requirements. The State, entitled to a deduction, reduced K & S's contract price $4,253.00. Claimant protested that the deduction should be only $2,550.00. The evidence presented by Claimant is insufficient to show that the reduction made by Respondent was not reasonable. The Claimant has the burden of proving its damages.

## Claim for Sandblasting and Painting of Metal Decking

While the roof was delayed on the Skilled Training Center by the State's inaction on the dispute as to the proper roofing material, water leaked into the building. Metal decking deteriorated from the elements. Claimant had to perform extra work to sandblast and paint the decking at a cost of $2,362.50 to which Claimant has presented sufficient evidence to substantiate its claim.

## Skilled Training Center Security Losses

The Court previously disallowed the claim for security losses as security was an obligation of Claimant under the basic contract documents.

## Window Water Leaks Caused by CDB's Failure to Properly Administer Glazing Contract

Claimant seeks $600.00 for an alleged failure of CDB to properly administer its prime contract with Southern Illinois Plate Glass. While the dispute over window caulking between CDB and Southern Illinois Plate Glass was ongoing, K & S had to mop up water and repair items damaged by water. Claimant made no showing that CDB's actions as to the contractor were unreasonable or the cause of delay. It may have been that CDB was right in the dispute. This claim is denied.

### Claim for Extra Labor and Material Due to Water Penetration for Lack of Center Section Roofing

The Claimant seeks additional damages for labor, materials, bond costs and markups based on water damage caused by the delay in the roofing of the Skilled Training Center. Because the sewer system was inadequate, water entered the building which had to be mopped up after each rain. The structural steel deteriorated due to the water and had to be refurbished. The total claimed including materials, labor, bond increase, overhead, and profit was testified to by Mr. Kraska of K & S to be $15,336.00. There was no contrary testimony to contradict the amount claimed and that such amount was reasonable. This claim will be allowed.

The Respondent does not contest Claimant's claim for profits which were included in the foregoing amount of damages citing *Egizii Electric v. State* (1973), 32 Ill. Ct. Cl. 93. *Egizii* does not stand for the proposition espoused by Respondent. That case states that "where a party to a contract has caused a breach, that party is liable for the increased costs and damages directly and proximately caused by such breach." The State stipulated to the damages in that case and profits were not an issue. The Court of Claims has awarded damages for profits and overhead in delay cases. (*J.F. Inc. v. State* (1988), 41 Ill. Ct. Cl. 5.) Indirect damages such as overhead and profit are appropriate measures of damages and the Court should allow such damages. *Johnson v. State* (1973), 39 Ill. Ct. Cl. 36.

The damages proven by Claimant for its delay claim and direct claims, as heretofore found by the Court, are reasonable.

In summation, the Claimant has suffered damages in the following amounts:

| | |
|---|---:|
| Delay claim | $150,000.00 |
| Lapsed appropriation claim | 46,204.00 |
| Claim for monies paid to excavator | 26,369.00 |
| Claim for excessive layouts | 3,500.00 |
| Claim for Co-Mac's failure to timely perform | 2,000.00 |
| Metal siding for walkways | 9,899.00 |
| Claim for end splash and support | 310.50 |
| Claim for expansion joint covers | 2,462.56 |
| Claim for additional lintels | 2,196.00 |
| Claim for aluminum thresholds | 237.00 |
| Claim for coal-tar buildup roof on the center section of the Skilled Training Center | 3,261.00 |
| Claim for sandblasting and painting metal deck | 2,362.50 |
| Claim for extras due to water penetration because of lack of center section roofing | 15,336.00 |
| Total Damages | $264,137.56 |

Claimant also requests interest on its damages. The Court of Claims has consistently followed the rule that the State is not liable for interest in the absence of a statute expressly subjecting it to such liability. Claimant cites no statute expressly making the State liable for interest in this case. *Gendel v. State* (1987), 38 Ill. Ct. Cl. 76; *Doe v. State* (1988), 40 Ill. Ct. Cl. 37.

Three questions remain. The Respondent raises the public policy issue that the actions of the State to try to keep Eanes Excavation on the job as a minority contractor was an important public goal and this excuses the State from delay claims caused by this important

public service. The argument is that a public policy goal was minority business participation in State contracts. In this case, Eanes Excavating could not obtain a performance bond. Later, working under a change order through K & S, it became obvious that Eanes could not do the job. The Respondent argues that the CDB took its actions to try to keep the minority contractor working for good cause and its actions were consistent with a strong public policy, and that to penalize the State for adherence to this societal goal would effectively contravene public policy. Even if it is assumed that this is a valid defense, and we do not find that it is, we are not convinced that the goal could not have been met with other means. While the goal was laudable, these contractors should not be the sole bearers of the cost of reaching it. The only ones penalized here would be a few contractors who the State wants to be left holding the bag. These contractors continued to work on the word of the CDB officials that they would be treated fairly. The State cannot be penalized because it is not the State's money that will be used to pay Claimant. The money comes from all the taxpayers in the State. If anyone should be "penalized" as Respondent suggests, then all the people should pay to spread the cost to all taxpayers for the public purpose.

The second remaining question before the Court is the State's recoupment action against Claimant. The State cites Ill. Rev. Stat. 1983, ch. 37, par. 439.25 in its affirmative pleading against Claimant for recovery, setoff or recoupment. Recoupment is a defense and this Court has jurisdiction thereof pursuant to section 8(e) of the rules of the Court of Claims.

The State seeks recoupment for the damages awarded by the Court to Lippert Brick, Lowry Electric

and Guarantee Electrical in an amount attributable to the breaches of the contract on the part of K & S Associates, Inc. K & S as general contractor had the obligation to manage the entire project by supervising, coordinating and expediting the assigned contractors. The general contractor had the duty to inspect the work as it was performed to assure compliance with contract documents.

The record is replete with competent evidence that the Claimant was not capable of coordinating this project once delay due to excavation problems took the project out of sync. Eventually the State took the coordination duties from K & S and gave them to the A/E due to Claimant's inability to coordinate the project. K & S was unable to develop appropriate recovery schedules. The construction schedules prepared by K & S were not realistic and provided for work out of sequence. K & S failed to provide office space at the site as required early in the project. This caused administration problems as no phones or utilities were available and pay progress meetings could not be held at the site. K & S failed to provide temporary heat at the site during the winter which slowed the progress of the work. Walls had to be relocated, anchor bolts required base plate corrections, pilings were not coordinated, and window frames had to be disassembled and refabricated due to K & S inadequacies. K & S was slow in processing insurance claims of Guarantee Electrical. Claimant was also very slow in submitting shop drawings which caused delays and K & S also has some culpability in the delay of the installation of the structural steel.

The State is to blame for the majority of delay on this project due to the excavation delay. The A/E has to share in the blame, too, for its poor draftsmanship. The Claimant must also be charged with a substantial part of

the delay due particularly to its inability to schedule and coordinate the project. While again the Court may seem arbitrary in its ruling, it would appear that a fair percentage of delay attributable to K & S would be 25%. The State was the cause of 65% of the delay and the A/E and others responsible for 10% of the delay. The damages in the three other cases totalled $310,403.81, 25% of which is $77,600.95 and that amount will be set off. We find that this Claimant should be compensated $186,536.61.

Finally, the question of entering an award remains. This Court cannot enter an award unless sufficient funds remain released and unexpended in the appropriation made to fund the project. See discussion in *Loewenburg/Fitch Partnership v. State* (1986), 38 Ill. Ct. Cl. 227 and *Ude, Inc. v. State* (1982), 35 Ill. Ct. Cl. 384. The transcripts in these joined cases are in excess of 3100 pages. The exhibits number in the hundreds, and include hundreds if not thousands of pages of information related to the cases. In the Court's review of the testimony and exhibits, no concrete evidence is found concerning any exact amounts of released and unexpended funds from the project. There is some evidence, although it appears to be hearsay, that the State was to fund 75% of the project and the user, East St. Louis Community College, was to fund 25%. Local funding had been an initial problem which caused the project a late start on bidding to the summer of 1978. There was also some testimony by CDB officials that there was no money available to pay any delay claims and that no delay claims were ever paid on this project. There was also some testimony about a contingency fund but nothing concrete enough for the Court's purposes.

Before entering judgment for the Claimant or making a recommendation to the General Assembly, we

will need the fiscal data including the balance of released funds which lapsed at the conclusion of the project. Respondent is ordered to file said information within 14 days.

## ORDER

These cases come on to be heard following the Respondent's response to the opinions entered herein on May 30, 1991, and the Court being advised;

In the aforementioned opinions the Court found that each of the Claimants suffered damages but refrained from actually awarding the damages pending the Respondent's submission of the fiscal data on the remaining balances of funds appropriated for the two projects. The Respondent has promptly complied with the directive and the claims are again before us.

The Respondent's reply is accepted as *prima facie* evidence of the facts contained therein pursuant to 74 Ill. Adm. Code 790.14. Respondent stated that a total of $19,879.00 lapsed in Appropriation Account Code Number 141-51184-4470-28-78 for CDB Project Number 810-029-001, the East St. Louis Junior College and VoTech. On the Community College of East St. Louis project, No. 810-092-001, the Respondent stated that $88,762.62 lapsed in three separate Appropriation Account Codes, 141-51184-4470-28-78, 141-51184-4470-60-75, and 141-51184-4470-60-79. One Appropriation Account Code, 141-51184-4470-28-78, is listed under both projects. This appears to be an artificial separation made by the CDB. In appropriating funds for the project the General Assembly apparently did not so designate the money or else it would have made separate appropriations. The Court sees no reason that this money should not be comingled. However, an

144

insufficient amount of funds lapsed to cover all of the damages.

As indicated in the prior opinion, it is this Court's policy in breach of contract claims to limit awards so as not to exceed the amount of funds, appropriated and lapsed, with which payment could have been made. To do otherwise, *i.e.*, to award money for debt incurred beyond the sum allotted by the General Assembly, would be tantamount to granting a deficiency appropriation. The appropriation of State funds is the constitutional prerogative of the General Assembly. It is the Court's duty to uphold that process. It is also the Court's duty to advise the General Assembly. (*Thorlief Larsen & Son, Inc. v. State* (1990), 42 Ill. Ct. Cl. 195; *Mary B. Bojko v. State* (1988, 1989), 41 Ill. Ct. Cl. 202; *J.F. Inc. v. State* (1988), 41 Ill. Ct. Cl. 5; *Loewenberg/Fitch Partnership v. State* (1986), 38 Ill. Ct. Cl. 227; *Ude, Inc. v. State* (1982), 35 Ill. Ct. Cl. 384.) Further, where there are several Claimants vying for the same lapsed funds and an insufficient amount lapsed to cover *in toto* all of the damages suffered, it is this Court's policy to make awards on a first in first out (FIFO) basis. *Thorlief Larsen & Son, Inc. v. State, supra* (1990); *Board of Trustees of Southern Illinois University v. State* (1988), 40 Ill. Ct. Cl. 146; *Aurora College v. State* (1985), 37 Ill. Ct. Cl. 321.

Among the four claims at bar, that of Guarantee Electrical Company was filed first. Guarantee suffered damages totalling $269,052.00 as a result of contract breaches on CDB Project No. 810-092-001 only. The total amount of lapsed funds on that project was $88,762.52. As previously pointed out, the lapsed funding for the other project should also be considered because it is one and the same appropriation. The

$19,879.00 will be added for a total award to Guarantee of $108,641.62.

The allocation of all of the lapsed funds to Guarantee on the FIFO basis renders moot which contractor filed next as the funds are exhausted.

For purposes of potential consideration of these four claims by the General Assembly and in fulfilling our role as an advisory body to the General Assembly we reiterate our finding in the prior decisions and point out that but for the insufficient amount of lapsed appropriations on this project we would have made the following awards of damages:

1. Guarantee Electrical Company—$160,410.38 (over and above the award to be made hereinbelow)
2. Lowry Electric Company—$18,975.00
3. Lippert Brick Contracting—$22,376.81
4. K & S Associates, Inc.—$264,137.56

Accordingly, it is hereby ordered that Guarantee Electrical Company be, and hereby is, awarded the sum of $108,641.62 and the other claims are denied solely for the reasons stated herein.

## AMENDED ORDER

This cause comes on to be heard on the Court's own motion to amend the order entered herein on June 18, 1991, so as to make a technical correction;

It is hereby ordered that the amount of damages for the Claimant K & S Associates, Inc. stated in the third line from the bottom of page 2 of the aforesaid order is changed from $264,137.56 to $186,536.61.