(Nos. 82-CC-0565, 84-CC-0375 cons.—

McCARTHY BROTHERS CO. and THE WALDINGER CO., Claimants, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed Feb. 21, 1995.*
*Amendment to opinion filed April 28, 1995.*

GREENSFELDER HEMKER WEISE GALE & CHAPPELOW and THOMAS R. LAMONT and CHURCHILL, NESTER & McDONNELL, for Claimant McCarthy Brothers.

SORLING, NORTHRUP, HANNA, CULLEN & COCHRAN, LTD. and WILLIAM R. KING and JOHN A. TEMPLER, JR., for Claimant Waldinger Corp.

JIM RYAN, Attorney General (TOM GRAY, Assistant Attorney General, of counsel), for Respondent.

## OPINION

FREDERICK, J.

These two cases arose from the construction of the Basic Science Building for the University of Illinois College of Veterinary Medicine in Urbana, Illinois. The claims were consolidated into one claim from two original claims filed respectively by McCarthy Brothers Company in 1981 and the Waldinger Company in 1983. McCarthy Brothers Company (hereinafter referred to as "McCarthy") filed its complaint with the Court of Claims on October 13, 1981, seeking $97,633.95 in damages from the State of Illinois, through its agency, capital development board (hereinafter referred to as "CDB"), for damages it incurred as a result of the Respondent's alleged breach of contract. The Waldinger Company (hereinafter referred to as "TWC") filed its complaint in the Court of Claims on September 1, 1983. TWC then amended its

complaint on September 24, 1983, seeking $709,929.03 in damages from the State for damages incurred as a result of the breach of contract by the Respondent. The Court consolidated the two claims on May 11, 1984.

A trial was held before the Commissioner assigned to the case on the following dates: July 13 through 14, 1992, and July 20, 1992. The evidence in this case is voluminous and consists of hundreds of pages of contract documents, award letters, construction plans and designs, correspondence among the parties and other contractors, engineers and architects, photographs of the construction site, depositions, joint stipulations to uncontested facts, and the report of the proceedings.

### The Facts

The construction project which is the subject of this litigation is the Basic Science Building of the College of Veterinary Medicine at the University of Illinois in Urbana, Illinois. In 1979, the Capital Development Board issued a series of contracts to the significant contractors as required under Illinois law. Construction was to proceed under two distinct phases, being Phase I and Phase II. Phase I involved site preparation and the erection of structural steel and concrete frame. Phase II principally involved the exterior and interior finishing of the structure.

McCarthy was awarded the contract to perform Phase I structural work and entered into a contract dated July 27, 1979, with CDB. In addition to erecting the structural frame for the building, McCarthy was to provide the Phase I "Temporary Utilities." The CDB set forth all requirements in the project manual. Howard Peters was in charge of the field work for McCarthy. TWC entered prime contracts under both phases of the construction. Under Phase I, TWC entered a contract with the CDB for

the construction of underground utilities. Under Phase II of the project, TWC entered contracts with CDB for heating and ventilation. Richard Wyninger was in charge of the field work for TWC. The work began in the early fall of 1979.

CDB's senior project manager for the project was Eugene Barish. As the senior project manager, he was the employee of CDB. Mr. Barish was responsible for monitoring the progress of the work. He was also acting as liaison between the architect-engineer, the prime contractors, the using agency, CDB and each of them for acting on any changes and work orders.

The architect-engineer for the project was Lester B. Knight & Associates, Inc. (hereinafter referred to as "Knight"). As architect-engineer, Knight was CDB's representative for the purpose of observing the work for conformance with the plans and specifications. Knight was also responsible for processing and approving all change orders issued in connection with the work on the project. Knight's contract provided that the "Architect-Engineer shall prepare when authorized by CDB, minor modifications and applications for change orders * * * and shall review and make recommendations on contractor's proposals." John Larson was the on-site representative for Knight. Scott Lawson was the designated Knight project architect.

In performance of its Phase I contract, TWC interfaced with McCarthy's work and certain of TWC's work was dependent upon the prior completion by McCarthy of its work. The same was true with respect to the Phase II contracts of TWC. McCarthy was responsible for constructing the basement foundation walls, the basement floor slab, driving certain pilings immediately adjacent to the basement walls, and backfilling the walls. A third contractor, C.

Iber and Sons, was responsible for the placement of the first floor concrete slab.

McCarthy commenced work on the project on October 1, 1979. During the performance of its Phase I work, McCarthy failed to maintain its scheduled performance, due to a problem in the driving sequence of certain piles causing movement of the adjacent walls. This delayed the performance of other Phase I and Phase II contractors, such as TWC. The problem with the driving sequence is at the heart of this litigation. The construction plan contained a Drawing S-1 which set the special pile driving sequence McCarthy was instructed to follow. Drawing S-1 specified that McCarthy would not drive the pilings immediately adjacent to the foundation walls until after the walls were poured and backfilling was complete.

As work proceeded through 1979, McCarthy informed CDB that the special driving sequence posed serious problems and should be changed. McCarthy specifically noted the sequence would cause delays in the completion of work and that if the walls were backfilled prior to driving the piles, the walls would move during the pile-driving sequence. Beginning in November 1979, McCarthy requested CDB and Knight to change the sequence; however, the requests were denied.

Pursuant to Drawing S-1, Foundations, section 2, McCarthy was contractually required to brace the basement walls "* * * to resist soil pressure until floor systems are completely poured." Included in its bid price was the only bracing system and materials described in the contract documents and actually provided to the project, to wit: a conventional lumber bracing system typically used on similar type projects with shoring on the top walls. On January 15, 1980, McCarthy advised CDB and Knight that the pressure exerted on the basement walls as a result of

the pile-driving operation would greatly exceed the pressure of the soil. McCarthy restated that they were only required to provide bracing sufficient to resist soil pressure, not to resist the force resulting from the pile driving. At this time, McCarthy requested Knight and CDB to provide it with direction for bracing the basement walls to resist the force of the pile-driving sequence.

On January 16, 1980, Knight advised McCarthy that it would provide McCarthy with direction respecting the bracing needed to resist the force of the pile driving. Two days later, Knight changed its mind and informed McCarthy it would not give any direction on bracing. McCarthy repeatedly through February 13, 1980, to July 1980 requested that it be permitted to drive the pile before the basement walls were poured and backfilled in order to avoid the problem. C. Iber and Sons, Inc. joined McCarthy in these requests. Knight refused all requests to change the pile driving sequence.

Mr. Scott Lawson, the Knight project architect, testified that it was his belief that Knight, at the time the bracing questions were being raised, made an assessment as to whether any type of temporary bracing could be effective to maintain the integrity of the walls and that the assessment was in written form. Mr. Lawson further believed that Knight assessed what loads would be put against the wall under the existing conditions. Mr. Lawson acknowledged that he felt that McCarthy's requests to Knight to provide direction as to what loads would be applied on the walls (the design parameters) was a reasonable request. McCarthy could reasonably request that Knight provide McCarthy with engineering criteria which would then be utilized by McCarthy to determine the construction materials that would be required.

In adherence with Knight's and CDB's refusal to change the sequence, McCarthy performed the work in strict accordance with the special driving sequence contained in Drawing S-1. The basement walls were erected from April through June 1980 and immediately braced to resist soil pressure. On July 22, 1980, McCarthy commenced driving the last row of pile, the one closest to the walls. At no time did CDB or Knight object to McCarthy's bracing system even though each clearly observed the system on site. Shortly after resuming pile driving, the walls moved. On July 22, 1980, Knight informed C. Iber and Sons, Inc. that the wall moved because "* * * the amount of bracing provided to keep the foundation walls in line is inadequate * * *."

On July 23, 1980, McCarthy advised Knight and CDB that the bottom of the foundation walls had now moved, that the pile driving sequence should have been changed, and that an extremely large and sophisticated bracing system would have been needed to protect against the pile driving sequence. Knight took the position on July 23, 1980, that the McCarthy bracing system should have been sufficient to resist soil pressure and vibration from pile driving. As a result of the wall movement, CDB directed Knight to conduct an investigation of the movement and directed McCarthy to cease further work in the area of the wall movement and to remove the backfill from around the basement walls. The CDB took the position on July 30, 1980, that McCarthy was responsible for the wall movement. CDB refused to pay McCarthy any additional compensation for removing the backfill. CDB takes the position that section 02350 of the Project Manual required McCarthy to protect other construction from pile driving operations.

McCarthy did not believe the wall movement and associated costs was its responsibility, because the work

had been performed in accordance with the construction documents; the walls were poured in correct location and braced to resist soil pressure and no movement occurred until after backfilling. Further, McCarthy believed it was free from responsibility because it had warned CDB, Knight and others as early as January 1980 that problems would occur as a result of the special drilling sequence.

On August 5, 1980, Knight, pursuant to CDB's direction to investigate the wall movement, engaged Danner & Associates, Inc. to perform surveying work on the basement walls and columns, George A. Kennedy and Associates, Inc. to perform structural engineering services, and A & H Engineering Corporation to investigate the existing condition of the pile caps adjacent to the basement excavation. On August 28, 1980, A & H informed Knight that the vertical load bearing capacity of the pile groups was not adversely affected, and structural steel could be erected upon them. McCarthy had expressed that same opinion as early as October 1979 that a change in the sequence would not adversely affect the vertical load bearing capacity of the pile groups. McCarthy had maintained from the date the walls moved that the structural steel could be erected because the bearing capacity had not been affected.

Knight had maintained from the outset that the piles could not be driven before erection of the walls because the piles relied on friction for their structural integrity which would be compromised if the special driving sequence was not followed. A & H's report concluded that Knight's concerns were not well based, lacked substance, and that there was no basis for the special driving sequence, compliance with which resulted in movement of the wall as predicted by McCarthy. A & H also made a recommendation that prior to starting any backfill around

the basement wall, the first floor framing be placed and, if possible, the first floor slab installed before backfill was placed. The George A. Kennedy and Associates, Inc. report found that the walls were not poured as shown in the contract drawings. On September 16, 1980, Knight accepted the conclusions and recommendations of its consultants, including the revised procedure for installing the first floor structural slab and basement slab to provide lateral stability for the basement walls before starting any backfilling.

The contract documents required that builder's risk insurance be purchased and maintained until substantial completion of the project. McCarthy obtained such an insurance policy. McCarthy took the position that all costs resulting from the wall movement were covered by, and reimbursable under, the builder's risk insurance policy. As early as August 28, 1980, CDB was aware of the possibility that said expenses would be covered by the builder's risk insurance. On October 2, 1981, McCarthy filed a claim for reimbursement of costs, losses, expenses and damages incurred by McCarthy in connection with the wall movement. McCarthy recovered $70,000 of its $71,792.67 claim from the policy. CDB made no claim on the builder's risk claim.

CDB claims it incurred $33,642.99 in added costs, losses or expenses as a result of the wall movement. CDB's project manager, Eugene Barish, could not, however, state why all expenses had been incurred or why they should be charged to McCarthy. The claim arose out of the same incident or occurrence which gave rise to the claim which McCarthy submitted on the builder's risk insurance policy. McCarthy requested CDB to file a claim under the policy. CDB refused to file a claim and assessed the expense to McCarthy. The contract documents provided that CDB

waives all rights against McCarthy for damages caused by any peril to the extent the loss or claim is covered by builder's risk insurance. McCarthy again informed CDB the deduction was incorrect and that CDB should look to the insurance policy for reimbursement.

McCarthy also has a claim against the CDB for an outstanding contract balance amount due. As set forth in its final pay request dated January 31, 1984, McCarthy's adjusted contract amount totalled $2,941,068.50. CDB total payments to McCarthy account for $2,935,064.54, leaving a balance due McCarthy in the sum of $6,003.96.

McCarthy also has made a claim against the CDB in relation to the temporary electrical power system McCarthy installed during Phase I of the project. McCarthy contracted to provide Phase I "Temporary Utilities." McCarthy was to provide and maintain specified temporary utilities for specified times during the construction period. Electricity was one of the utilities to be provided. The project manual described the electric system to be followed, which was not the one originally described in the bid documents. The power level of the electricity was to be sufficient to meet Phase I construction needs. No individual contractor performing Phase I work requested electrical power in excess of that provided by McCarthy.

After completion of Phase I, McCarthy was to turn over to the Phase II general contractor responsibility for providing and maintaining temporary utilities. The project manual set forth the same terms regarding the Phase II temporary electrical services for the general electrical contractor, Commonwealth Electric Company as the Phase I terms applicable to McCarthy except for an increased number of journal boxes.

McCarthy brought electrical power to the construction site through the University of Illinois. An agreement to use the university's electrical lines for power was reached. McCarthy then subcontracted with Aladdin Electric to install a system to supply and distribute temporary electric power for Phase I construction needs. The total cost incurred by McCarthy in supply and maintaining Phase I temporary electric service was $5,222. The Phase I temporary utilities were turned over to C. Iber & Sons, Inc. on November 9, 1979, at which point the Phase II Electrical Contractor took over responsibility for providing temporary electric service. C. Iber & Sons, Inc. wrote to McCarthy on February 28th asking McCarthy to install the temporary electrical system described in the project manual. McCarthy replied that the temporary electrical system it had installed had been approved by Knight and CDB in accordance with the contract documents.

Knight responded to McCarthy by stating that McCarthy was obligated to supply the specified minimum electrical system set out in the Phase I project manual regardless of construction needs. CDB concurred with Knight's assessment. CDB gave McCarthy notice that if it did not begin to install the specified minimum electrical system, a deduction would be made in the amount due McCarthy equal to the cost of hiring another contractor to install the electrical system. McCarthy did not respond and CDB hired Commonwealth Electric Company to finish installing a temporary electrical system at a cost of $47,000. The system installed by Commonwealth was materially different from the system described by the project manual for either Phase I or Phase II. CDB issued a deduction from the amount due to McCarthy in the sum of $47,000. CDB also issued a deduction in the amount due McCarthy in the sum of $10,987 for the cost of contracting with Illinois

Power Company to bring electricity to the construction site.

TWC was a contractor on both Phase I and Phase II of the project. When the walls moved as a result of the driving sequence, the schedule for work performance was affected for all prime contractors, including TWC. By reason of the failure of the basement walls, the remaining performance of the Phase I construction, already delayed by reason of McCarthy's delayed performance, and the construction of the Phase II work were significantly impacted. Extended delay to the project occurred during assessment and correction of the wall failure, changes in sequencing of the work occurred which essentially eliminated a normal construction schedule, and extensive work on the project was required to be performed during exposure to winter conditions. Under the original project schedule, all of such work would have been performed within a structure closed to the weather.

Scott Lawson of Knight acknowledged that a substantial reason the project was not on schedule at the end of 1980 was due to the problems encountered with McCarthy's work in Phase I. He further acknowledged that work on the project was then accelerated with the architect and CDB still trying to meet a completion date from the original schedule and looking at ways to compress that schedule because of the project delay which had occurred. All of the major prime contractors on Phase II work notified CDB that they would seek reimbursement for their added costs attributable to the project delay, resequencing and acceleration. CDB was timely and properly advised by TWC as to the fact that TWC sought time extensions and would seek reimbursement for costs. Claims subsequently filed by TWC in connection with the three contracts it held were timely and properly filed.

No time extensions for the contract time associated with the wall failure or other delayed performance by McCarthy were ever granted by CDB. CDB elected to accelerate the contractor's performance of the project following the wall failure in order to reduce the amount of project delay which would otherwise occur. The accelerated work, together with the project delay and the work having to be performed out of sequence, resulted in substantial impacts on major portions of the labor work of TWC. Under the contract documents, CDB was obligated to grant time extensions to TWC for unreasonable delays in time of performance of the project. The backfilling was 7½ months delayed. The pouring of the grade beams and walls were five months delayed and the pouring of the slab on grade in the basement was 5½ months delayed. The completion of the structural steel was six months delayed.

Wagner, Hohns, Inglis, Inc., a nationally-known consulting firm which provides CPM scheduling, project management and consulting work in claims analysis throughout the United States, was employed to develop the Critical Path Method scheduling for the project. William Wagner is one of the principles hired by C. Iber and Sons, Inc. Mr. Wagner testified about the scheduling problems associated with the wall movement delay. He periodically gave updates on the scheduling project. In the third update report, he concluded that the final completion date was 162 days later than the revised contractual completion date of April 6, 1982, and stated: "All Phase II contractors should be granted an extension of time in the above amount to compensate for delays due entirely to lack of progress by the Phase I contractor." Mr. Wagner showed charts demonstrating the numerous scheduling changes disrupting the normal construction

sequence for TWC on both of its Phase II contracts requiring work to be performed out of sequence and on different floors, contrary to normal construction practice. He explained the inefficiencies connected with the performance of the work in that respect and how manpower productivity particularly would be adversely affected. TWC's Phase II ventilation contract was adversely affected by moving the completion date by 9½ months. Mr. Wagner testified that the six-month delay in Phase I work of McCarthy resulted in a ten-month delay to the Phase II contractors.

The project manual and the standard documents for construction contain provisions that a contract time is of the essence. Article 4, section 4.10D states that,

"° ° ° extensions of the contract time will be made for delays which affect critical items on the construction schedule arising from unforeseeable causes beyond the control and without the fault or negligence of the contractor or of his subcontractors or suppliers, including, but not restricted to: Acts of CDB, the Architect-Engineer or ° ° °. Acts of other contractors in the performance of a contract with CDB ° ° °."

Under the contract documents, CDB was obligated to grant extensions of time to TWC to which it was entitled for the three contracts it held on the project. CDB was also obligated to contractors for added costs associated with the acceleration of its work by the CDB. Each of the three contracts contained a time-is-of-the-essence clause. Guy Gast, vice president of operations for TWC, testified regarding the claims of TWC. Mr. Gast, in detailed testimony, explained each element of the claim and the manner in which it had been calculated, the business records of TWC which had been utilized in obtaining the data, and also the analysis of the data. Most of the damage items related simply to the extended contract time attributable to the delay caused by the untimely performance by McCarthy of its Phase I contract and the resulting unavailability of the site for performance of work by TWC in performing its contracts.

Mr. Gast explained in detail the various ways in which the labor of TWC was adversely affected during performance of its Phase I contract for site utilities and then addressed the manner in which that adverse impact on labor productivity was determined. He discussed the use of what is called bulletin 58, "Factors Affecting Productivity," a publication developed by the Mechanical Contractors Association of the United States. Similar testimony was received relating to the Phase II contracts.

TWC seeks to recover from the CDB damages and compensation under its site utilities contracts the sum of $91,795; TWC seeks to recover from the CDB damages and compensation under its heating contract the sum of $399,988.03; and TWC also seeks to recover from the CDB damages and compensation under its ventilation contract the sum of $218,146. The total amount being sought by TWC is $709,929.03 as a result of the CDB denying any extensions of time and subsequent acceleration of the project impacting on TWC's labor efficiency, expenses and costs.

## The Law

The Claimant, TWC, points out in its brief that the CDB had, through its counsel on May 11, 1990, filed a motion for summary judgment. TWC argues that the law on admissions by a party in a pleading is applicable in this case and sets forth the admissions of the CDB which it argues are binding upon the Respondent. (*Chimerofsky v. School District No. 63* (1970), 121 Ill. App. 2d 371, 374.) In the motion for summary judgment, the Respondent stated as follows:

"The evidence supports the facts that McCarthy Brothers did in fact follow the design specifications of the A/E on the project. The walls, which were the true cause of the delay on the project, were due to faulty design administration by Knight."

The Motion goes on to state:

"There can be no doubt then, that the delay claim which claimant (TWC) pursues against the CDB, has as its root, the unfortunate compliance with the A/E's design specifications by McCarthy Brothers. Under the cases cited above, The Waldinger Company had a valid claim against Lester B. Knight & Associates for design negligence."

The project manual and contract documents expressly provide that a contractor will be entitled to damages or compensation from CDB through an adjustment of its contract sum for unreasonable delays caused by CDB or the architect-engineer. The statements set out in the motion for summary judgment are binding admissions by the Respondent. In *State Security Insurance Co. v. Linton* (1978), 67 Ill. App. 3d 480, 384 N.E.2d 718, 721, the court stated: "* * * that once a statement of fact has been admitted in the pleadings, it constitutes a judicial admission, it is binding on the party making it, and it makes it unnecessary for the opposing party to introduce evidence in support thereof * * *." These admissions have not been withdrawn by the Respondent and are not alternative theories. They therefore became judicial admissions for purposes of this action and are conclusive as to the matters admitted. *Beccue v. Rockford District* (1968), 94 Ill. App. 2d 179.

Pursuant to the contract between McCarthy and CDB, McCarthy owed CDB the duties to (a) perform its scope of work in a reasonable workmanlike manner and (b) follow the plans and specifications issued to it by CDB. (*Economy Fire and Manufacturing Co. v. Raymond Concrete Pile Co.* (1940), 111 F.2d 875, 878 (7th Cir.).) McCarthy has presented substantial and persuasive evidence respecting its reasonable workmanlike manner. McCarthy made attempts to convince the CDB and Knight that the pile-driving sequence would cause a problem in shifting the walls. McCarthy was denied in its efforts to change the sequence. McCarthy followed the

pile-driving construction plans despite its concerns, because McCarthy was not allowed to change the sequence by the CDB and Knight. McCarthy supported the wall with a bracing system of the type customarily used in performing work of the nature being performed by McCarthy on the project. Moreover, the bracing did, in fact, hold the walls in place and "resist soil pressure" as required by the contract documents.

"Contractors have no right to depart from working plans made part of the contract. If they do so, it is at their peril, and they become guarantors as to the strength and safety of the structures ° ° °. An express contract admits of no departure from its terms, and the subcontractors could discharge themselves from liability only by constructing the buildings in accordance with the plans and specifications, unless a deviation was mutually agreed upon." *Robert G. Regan Co. v. Fiocchi* (1963), 44 Ill. App. 2d 336, 194 N.E.2d 665, 668.

McCarthy was obliged to construct the piling and foundation walls in the manner and sequence specified in the contract documents. As long as McCarthy complied with the contract requirements, it was not responsible for the movement of the wall.

Claimant, McCarthy, relies heavily on the case of *St. Joseph Hospital v. Corbetta Construction Co.* (1974), 21 Ill. App. 3d 925, 316 N.E.2d 51. In *St. Joseph, supra*, the contractor provided the exact paneling specified by the architect only to subsequently learn that the specified material did not comply with applicable building codes. At issue was: "when an owner through its agent architect directs the contractor to install certain material does not the owner impliedly warrant to the contractor that the material is suitable?" The analogy is drawn that similarly when an owner, through its agent or architect, directs the contractor to perform its work in a specific and mandatory sequence, does not the owner impliedly warrant to the contractor that the sequence is suitable? The case sites to 6th Williston on Contracts, "° ° ° though the builder may be liable if he

fails, by reason of defective plans furnished him, to complete work which he has undertaken, yet if he can and does complete it according to the plans he is not liable for subsequent inferiority, injury, or destruction of the work, due to the defective character of the plans." The Court determined that "* * * the defective plans and specifications causing the difficulty were issued by the owner's architect, not the owner, and yet the court in such cases held that the owner was bound and that the contractor who followed them was not liable to the owner." 316 N.E.2d at 65.

McCarthy was required to follow the plans provided by CDB and, therefore, is not liable for errors or defects in the plans and specifications. CDB, as owner, warrants the adequacy and accuracy of the plans and specifications. (*United States v. Spearin* (1918), 248 U.S. 132.) The plans and specifications issued to McCarthy by CDB were defective in that McCarthy's compliance with the Special Driving Sequence set forth on Contract Drawing S-1 resulted in the movement of the foundation walls. CDB admitted this in its motion for summary judgment and the evidence presented supports this conclusion.

Upon discovery of this defect during Phase I, McCarthy reasonably notified CDB and its architect of the defect, warned of the damage that would result, and requested that the sequence be changed. CDB refused McCarthy's requests as a result of which McCarthy strictly complied with the sequence and, predictably, the walls moved. Respondent has argued that McCarthy failed to protect other construction from pile-driving operations, failed to present a change order, and did not pour the walls as shown in the contract drawings. McCarthy is not fully at fault for the movement of the foundation walls and is not fully responsible for the cost incurred by CDB as a result of the wall movement.

CDB's costs incurred as a result of the wall movement were covered by the builder's risk insurance policy. Whatever the reason for CDB's unwillingness to submit a claim, its refusal to do so resulted in a waiver of its right to assess its costs against McCarthy by virtue of General Condition 5.006.H of the contract documents. CDB's deduction of $33,642.99 from McCarthy's contract to reimburse CDB for the costs incurred as a result of the movement of the foundation constituted a breach of the contract.

McCarthy also has a claim for payment of the contract balance alleging CDB has failed to pay the balance of $6,003.96. CDB presented no defense respecting its failure to pay. CDB's failure to so pay McCarthy constitutes a breach of contract.

The final claim McCarthy has made against CDB is regarding the temporary electrical system that CDB billed McCarthy for when CDB determined that the system McCarthy installed was not sufficient nor within the contract requirements. Phase I bidders were advised that "the designated contractor shall pay all costs of installation, operation and maintenance, restoration and warranty extension of temporary utilities" until "assignment to the General Contractor for Bid Package II occurs" at which time "all temporary materials and equipment shall be turned over to the General Contractor for Bid Package II." The Bid II documents were not issued at the time of the Phase I bid. The contract document set forth an addendum stating the deletion of instructions to install the system "* * * where shown on the drawings." This addendum served to confirm to McCarthy that the temporary electric specification was a performance specification related to Phase I construction needs rather than a detailed design specification which located the system

throughout the project for service to both Phase I and II contractors.

Knight originally agreed with McCarthy's position that Bid Package I only required McCarthy to provide temporary electric for the reasonable needs of the Bid Package I bidders for work to be performed during the Phase I construction. It was the Phase II electrical contractor who urged CDB to find McCarthy was required to provide a more expansive electrical system whether or not needed by the Phase I contractor. CDB thereafter demanded that McCarthy install a much more comprehensive system. When McCarthy failed to do so, CDB had the Phase II electrical contractor install an adequate system for the Phase II construction needs. The system was not the one described in the specifications because all parties agreed that such a system was too elaborate, expensive and far beyond the construction needs of the project.

McCarthy's understanding of its requirement for an electrical system was that if the needs of the Phase I contractors exceeded what McCarthy installed, then those portions of the specifications containing details of temporary electrical system would come into play, then and only then. The specification left it to the skill, experience and risk of the bidder to evaluate the construction needs accurately. If the estimate proved too low in relation to actual needs, McCarthy would be obligated to supply, at no cost to CDB, a system within the parameters detailed to meet the needs of Phase I of the project.

The specification is ambiguous in that McCarthy interpreted the specification as a performance specification requiring McCarthy to provide an electrical system sufficient to meet Phase I construction needs rather than CDB's subsequent interpretation that the Temporary Utilities specifications were design specifications instruct-

ing McCarthy as to each and every component of the system to be provided. The Claimant argues that the rule of *contra proferentum* is applicable. The contract must be construed most strongly against the drafter. Under the rule of risk of ambiguity, lack of clarity and absence of proper warning is on the drafting party which could have forestalled the controversy. The rules pushes the drafters toward improving contractual forms, and it saves contractors from hidden traps not of their own making. *Sturm v. United States* (1970), 421 F.2d 723 at 727.

Under McCarthy's interpretation, there is no duplication of facilities, or duplication of payment or windfall benefit to either side. The temporary electric needed and necessary for Phase I was provided by the structural contractor, and the temporary electric needed and necessary for Phase II was provided by the electrical contractor. This result is reasonable, conforms with trade usage, and is consistent with the public building policy and elimination of contingencies, duplication and waste in the construction of public works. It would be unfair to allow CDB to reap the benefit of McCarthy's decision to undertake that risk in the form of a reduced bid while at the same time requiring that it provide a temporary electric power system far in excess of the construction needs. CDB's deduction of $57,987 from McCarthy's contract to reimburse CDB for the costs incurred to provide more elaborate temporary electrical power than needed for Phase II construction needs was wrongful. McCarthy argues that its claim for the electrical system should be granted for $57,987.

In regard to TWC's three claims, the Court's attention is directed to the Standard Documents for Construction, where it is provided in article IV, section 4.10(B) that,

"Extensions of the contract time will be for delays which affect critical items on the construction schedule arising from unforeseeable causes beyond the control and without the fault or negligence of the contractor ° ° ° including acts of CDB, the architect-engineer ° ° ° or ° ° ° acts of other contractors in the performance of a contract with CDB ° ° °."

The record clearly indicates that the delays experienced by TWC under its three contracts and for which the claim is made in these proceedings, result mainly from actions or failure to act on the part of CDB, Knight or a contractor under direct contract with CDB. The CDB clearly recognizes this in its own admissions that the delays were caused by the inaccuracy of the driving sequence set by Knight. Control over this sequence was clearly out of the hands of the Claimant, TWC.

The purpose of the obligatory extension of contract provision is to relieve the contractor affected from its scheduled time of performance thereby avoiding acceleration of its contracts with all of the attendant labor and inefficiencies described in the trial proceedings. The timely granting of an extension of time also provides to a contractor such as TWC the ability to schedule its work in accordance with a planned schedule rather than incurring delays, as in the present case, because of a total project being performed out of sequence.

The CDB, having chosen not to perform its obligations to grant time extensions under the contract with TWC, now cannot claim that TWC cannot recover against the CDB for damages. Under Illinois law, a party who materially breaches a contract cannot take advantage of the terms of a contract which are to its benefit. *Goldstein v. Lustig* (1987), 154 Ill. App. 3d 595.

The Claimant, TWC, comments on the State's failure to produce several key witnesses, including Gene Barish, the CDB's project manager for the site. Gene Barish

made admissions in the deposition that there were in fact project impacts and they were of serious extent, resulting to TWC from McCarthy's delayed performance and the wall failure. The case of *Tepper v. Camp* (1949), 76 N.E.2d 490 established the "missing witness rule." The principle of the rule is that failure of a party to produce evidence available to that party and which testimony could have been produced if that party's position was true, would give rise to a presumption against the party.

The missing witnesses in this case are pointed out by Claimant as Gene Barish, John Larson and Scott Lawson. Howard Peters, the McCarthy project manager, had several conversations between himself and these three persons during which he told them that McCarthy was not going to provide bracing beyond that necessary to resist lateral soil pressure, that the bracing which McCarthy would be using would not be adequate to withstand the resumption of pile driving, and that the walls would fail when pile driving resumed. All three of these individuals were within the control of the Respondent to produce at trial. The Claimant argues and reasonably so that the presumption must be recognized that if any of the three individuals had been called, their testimony would have been unfavorable to the Respondent. They would have had to acknowledge that the subject conversations did, in fact, occur.

The Claimant, TWC, has clearly established a basis for damages on its three contracts. Mr. Gast explained how the figures were calculated. The method follows the procedures set out in the industry by Bulletin 58. The law states that where there is a lack of certainty or precision as to the amount it is not fatal to the recovery, providing there is a reasonable basis for computation of the damages. *Jackson v. United States* (1987), 12 Ct. Cl. 36; *Bockman Printing &*

*Services, Inc. v. Baldwin-Gregg, Inc.* (1991), 213 Ill. App. 3d 516.

The Claimant, TWC, has argued that it should receive $91,795 for damages on the site utilities contract, $399,988 on the heating contract, and $218,146 on the ventilation contract. Most, if not all, construction projects will have some delays. Projects with multiple contractors requiring coordinated efforts are more likely to have delays. In this case, the majority of the delays are attributable to the architect-engineer and CDB. Much less delay is attributable to the contractors. For a delay to be tolerated, it must be reasonable under the circumstances. Much of the delay on this project was beyond reasonable. (*K & S Associates, Inc. v. State* (1991), 43 Ill. Ct. Cl. 117.) As this Court found in *K & S Associates, Inc., supra*, we do not believe that the damages are computable to the penny as Claimants have tried to show. With the fact that some delay is reasonable and inevitable and the inherent speculative nature of computing losses in construction cases, we must try to find a fair figure for damages after weighing the evidence as is the Court's responsibility. *Neylon v. State* (1985), 39 Ill. Ct. Cl. 65.

We are also confronted with the fact there was no proof from the insurance company that the builder's risk claim would have been allowed for CDB and what part of the electric system construction could reasonably be charged to McCarthy. Admittedly the figure of damages may appear arbitrary but the damage figure we find is the result of the Court's extensive review of all the evidence and taking into account the aforesaid variables peculiar to construction project cases. We believe our findings of damages are fair under the peculiar circumstances of this case.

For the foregoing reasons, we find that Claimant, McCarthy Brothers Company should be compensated in

the sum of $76,154.88 and that Claimant, the Waldinger Company should be compensated in the sum of $582,141.80.

Finally, as is often the case, the question of entering an award remains before the Court. This Court cannot enter an award unless sufficient funds remain released and unexpended in the appropriation made to fund the project. (*Lowenburg/Fitch Partnership v. State* (1986), 38 Ill. Ct. Cl. 227; *Ude, Inc. v. State* (1982), 35 Ill. Ct. Cl. 384.) There is no evidence before the Court from which the Court can determine if appropriated funds remain from which to make an award. We are also concerned that the case was on general continuance and there is no evidence from which the Court can determine if the Claimants or either of them had successful claims against other entities which would reduce the awards. Therefore, before entering an award for the Claimants or making a recommendation to the General Assembly, we need additional information. Respondent is ordered to file the fiscal data on this project, including the balance of released funds which lapsed at the conclusion of this project so that the Court can determine what amount of award can be made, if any. Respondent shall file this information with the Clerk of Court within 21 days. The Claimants shall each file with the Court within 21 days a statement regarding claims made against other entities for these same damages and the results of those claims.

## AMENDMENT TO OPINION

FREDERICK, J.

This claim is before the Court following the entry of the opinion hereon of February 21, 1995, and following the parties' compliance with the instructions issued at the conclusion of that opinion. The Court finds:

(1) That the Claimants have received no funds from collateral litigation which can be used to offset the damages.

(2) A total of $1,003.96 of 141 CDB bond fund money lapsed on the McCarthy Brothers Company contract and $5,000 was held in its retention trust account. The CDB has agreed to release the money in the retention trust account.

(3) No funds lapsed or are otherwise available to pay the damages suffered by the Waldinger Corporation.

(4) The Court is restrained to limit the awards in these claims to $6,003.96 for McCarthy Brothers Company and to $0 for the Waldinger Corporation.

(5) For purposes of potential future consideration of these claims by the General Assembly we reiterate our findings on page 21 of the February 21, 1995, opinion and hereby advise that McCarthy Brothers Company should be compensated $76,154.88 less the $6,003.96 which will be awarded and the Waldinger Corporation should be compensated $582,141.80.

Wherefore, it is hereby ordered that McCarthy Brothers Company is awarded $6,003.96, $5,000 of which is to be paid through the actions of the CDB with respect to the retention trust fund and $1,003.96 is to be paid with 141 bond fund money; the Court is constrained to, and hereby does, deny an award for all other damages heretofore found to be suffered by both parties.